**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | |
|---|---|
| **BRIAN AND SUSAN FERNAAYS, et als.,** | ) |
| | ) |
| v. | )   Case No.: 2:21-cv-99 |
| | ) |
| **ISLE OF WIGHT COUNTY,** | ) |
| | ) |
| Defendant. | ) |

<u>**PLAINTIFF'S RULE 26(a)(2)(B) DISCLOSURES**</u>

Plaintiffs, by counsel, disclose the following pursuant to Federal Rule of Procedure

26(A)(2)(B) and the Scheduling Order entered in this matter:

> John T. ("Jack") Claud, III
> HOGGARD-EURE ASSOCIATES P.C.
> 901 Port Centre Pkwy, Unit 5
> Portsmouth, VA 23704

Mr. Claud is expected to testify to the drainage improvements within the drainage

easement including their type, construction method, failure, and method of repair. Mr. Claud's

letter opinion is attached as Exhibit A.

> Mr. John Steve Ferguson, L.S.
> HOGGARD-EURE ASSOCIATES P.C.
> 901 Port Centre Pkwy, Unit 5
> Portsmouth, VA 23704

Mr. Ferguson is expected to testify to the surveying of the drainage easement and the rate

of failure drainage improvements. Mr. Ferguson's survey report is attached as Exhibit B.

> Ms. Patricia Raper
> STEWART TITLE & SETTLEMENT SERVICES, INC.
> 1434 Crossways Blvd., West Wing, Suite 290
> Chesapeake, VA 23320

Ms. Raper is expected to testify to the documents recorded related to the Brewer's Creek

subdivision and the Oyster Court subdivision. Ms. Raper's title report is attached as Exhibit C.

<u>Exhibit A</u>

2

Ms. Nanette Criddle
ROSE & WOMBLE REALTY, LLC
5857 Harbor View Boulevard, Unit 100
Residency:  Suffolk, Virginia.

Ms. Criddle is expected to testify to her duty as a real estate salesperson to disclose

known defects and sinkhole's negative impact on the marketability of the subject property.  Ms.

Criddle's report is attached as Exhibit D.

Mr. Dennis Gruelle, MAI, SRA
APPRAISAL CONSULTATION GROUP
5511 Princess Anne Road
Virginia Beach, VA 23462

Mr. Gruelle is expected to testify to the value of the subject properties before and after

the failure to maintain the drainage easement.  Mr. Gruelle's reports are attached as Exhibit E

and F respectively.

**GUY BROCK**
**SUE & BRIAN FERNAAYS**
**TAX MAP: 34H-01-031 & 032**

By  */s/ Joseph V. Sherman*
        Joseph V. Sherman

Joseph V. Sherman
 VSB No. 86099
JOSEPH V. SHERMAN, P.C.
324 West Freemason Street
Norfolk, Virginia 23510
Telephone:  (757) 350-8308
Facsimile:  (757) 351-4663
E-mail: joe@lawfirmjvs.com

3

## **CERTIFICATE OF SERVICE**

I certify on this 7th day of October, 2021, this PLAINTIFF'S RULE 26(a)(2)(B) DISCLOSURES was sent by e-mail and mail to counsel of record including:

D. Rossen S. Greene, Esq.
**PENDER & COWARD, P.C.**
117 Market Street
Suffolk, Virginia 23434
Telephone: (757) 502-7333
Facsimile: (757) 502-7376
rgreene@pendercoward.com


   */s/ Joseph V. Sherman*   
Joseph V. Sherman

# EXHIBIT A

CAUSE AND EFFECT OF FAILURE TO MAINTAIN
DRAINAGE EASEMENT IN ISLE OF WIGHT, VA
JACK CLAUD, ASSISTANT DIRECTOR OF PRIVATE DEVELOPMENT
HOGGARD-EURE ASSOCIATES P.C.

## I.      GENERAL COMMENTS ON FACTUAL BACKGROUND

The Brewers Creek subdivision is located in Isle of Wight County and was constructed thirty (30) years ago.  The outfall and culvert in question are located between Lots 31 and 32 as shown on the subdivision plat completed by Miller-Stephenson & Associates, P.C. in 1989 attached as Exhibit A. The plat established a 20-foot drainage easement around the culvert and outfall, which extended 10 feet onto lots 31 and 32 each. Lot 31 is bordered to the north by Deep Water Way, to the east by lot 32, to the west by lot 30, and to the south by a natural ravine which drains the stormwater to Brewers Creek. Lot 32 is bordered to the north by Deep Water Way, to the east by lot 33, to the west by lot 31 and to the south by the same natural creek. The Brewers Creek subdivision was designed to drain runoff from multiple private properties into the right of way of Deep Water Way to curb inlets and out to the creek. The creek collects water from portions of the subdivision and drains east to the James River. The concrete culvert drains from the southern curb of Deep-Water Way to the north embankment of the ravine and resulting creek.  Oyster Court subdivision also drains the same way to the same creek from the southeast.

## II.     ENGINGEERING BEFORE FAILURE OF DRAINAGE PIPE

The County bonded construction of reinforced concrete pipe (RCP) with a flared end section (FES) - a common design practice at the time of installation. The RCP stormwater system is the benchmark that all other storm systems are measured against both in terms of durability and functionality. The RCP is placed on a compacted stone surface called pipe bedding. This pipe bedding is designed to prevent the RCP from sinking lower than its intended position. Pipe bedding material is the most effective when the RCP rests on it properly. RCPs are heavy and require installation in sections. These pipe sections are assembled using tongue and groove connections with butyl polymer gaskets and depend on the support of the pipe bedding beneath them to stay together. The RCP connects to a FES to complete the outfall structure.  FESs are wider than the pipes they connect to allow the water to slow before entering the ravine. The VDOT EC-1 culvert outlet protection prevents erosion under the FES. VDOT EC-1 requires a layer of stone rip-rap to be installed over a geotextile lining.  The rip-rap requirements correspond in size to the volume and velocity of water calculations performed contemporaneous to recordation.  The culvert outlet protection requires inspection of rip-rap at regular intervals and maintenance as required.

Executive Summary
Fernaays/Brock
Mr. Jack Claud

## III.   ENGINEERING FAILURE OF DRAINAGE IMPROVEMENTS

Generally, VDOT erosion control does not fail all at once.  Damage that occurred to date is a direct result of almost 30 years of little to no maintenance.

After construction, the water that flows out of the FES would fall onto the rip-rap protection and flow into the exposed creek bed in the natural ravine.  Over time, the exposed portion of the creek bed washes away and leaves a small washed-out depression just beyond the rip-rap protection.  With no soil holding rip rap rocks in place on the ravine slope, the consistent force of the water hitting the rocks pushes the rocks away from the FES and leaves the outfall exposed. At that point in time normal maintenance should occur.  A crew should check the outfall for any rock movement or rock bed washout.  The crew should augment the rip-rap and backfill as needed to bring it back to design conditions. If no effort to replace the culvert outlet protection is made, the rocks slide into the ravine and the FES is exposed and vulnerable to erosion and RCP failure begins.

When the outfall is left without rip-rap, small rainfall events provide a constant trickle of water that saturates the ground beneath the FES. If the material beneath the FES is saturated, it loses its soil support capabilities and even small amounts of water will wash the compromised material away.  The problem is exacerbated during large rainfall events.  When an increased flow of water hits the unprotected ground the water washes away even larger amounts of material from underneath the FES.  When enough material is washed away the structure is no longer supported and falls away from the connecting pipe section. Once the FES falls away from the RCP section, the pipe bedding becomes exposed.  Without a FES attached to the RCP, water trickles over the bottom lip of the pipe and saturates the pipe bedding beneath.

When the pipe bedding is wet for extended periods of time the bedding washes out from under the pipe.  Once the material underneath the RCP section is washed away, the pipe is not supported and its connection to the previous RCP section is severed.  When the pipes are no longer connected, water leaks out of the tongue and groove connection, around its gasket, and saturates the remaining pipe bedding material and supporting soil.  When enough pipe bedding material is washed away the RCP section begins to sink. Once the section begins to sink, the water washes away material from the side of the RCP creating a void around the pipe.  The void becomes so large that the earth above falls away and exposes the previously buried pipe section creating a sinkhole. Any water from the surrounding property that does not enter the drainage system

through the curb inlet flows over the ground in the form of sheet flow.  This sheet flow washes away material and contributes to the growing sinkhole. Maintenance at this stage of failure removes the disconnected pipe sections, replaces the pipe bedding material, resets the pipe to its design slope, and backfills.  Maintenance did not occur at this stage of failure and as of the date of this writing a large portion of RCP lays exposed in an open sinkhole, and signs of impending failure are visible the length of the drainage easement to public road Deep Water Way.

In the public road at the end of the 20' drainage easement there is a new sinkhole forming at the entrance to the curb inlet in the roadway.  Curb inlets are installed with an opening for the connecting pipes.  The diameter of the opening is larger than the connecting pipe to ensure there is enough room for the pipe to connect.  The pipe is placed inside of the opening in the curb inlet structure and the voids where the pipe meets the structure are filled with grout to ensure water does not leak around the drainage structure or the pipe at the connection.  The earth around the pipe is backfilled and compacted for placement of asphalt road.

If the connection between the pipe and the curb inlet structure is not sealed, stormwater flows outside of the drainage structure.  During storm events, water flows over the asphalt road and seeps into the earth at the point where asphalt meets the curb.  If properly installed, the water would stay in the earth and make its way to the ground water table.  However, if the drainage structure beneath the road is not sealed, water will enter the curb inlet structure through the openings around the connecting pipe.  That water washes sediment from around the pipe into the curb inlet structure leaving a void behind. The more water that makes its way into the drainage structure, the more earth is washed away from under the roadway and around the pipe.  When there is a large enough void beneath the asphalt that it falls into the hole and creates a sinkhole at the point where the asphalt meets the concrete curb. The sinkhole will continue to increase as more dirt is washed into the curb inlet through the opening in the structure wall.

To repair the damage, the ground needs to be excavated to expose the entire pipe connection to the curb inlet structure, the voids need to be re-grouted and sealed properly to prevent stormwater leaking out of the system and causing further damage.  The fill material needs to be replaced and compacted to allow for the replacement of the asphalt roadway.  This is required in this case.

## IV.     OPINION AND ANALYSIS OF SINKHOLE

The sinkhole is crevassed more than twenty (20) feet wide at its largest point and will continue to widen if not repaired.  When water flows through the crevasse created to the bottom of the ravine it washes away the sediment and

Executive Summary
Fernaays/Brock
Mr. Jack Claud

natural material at the bottom of the embankments.  Material on top falls into the hole created.  There is an active and ongoing dangerous area around the holes created beneath the easement to the public right-of-way and encroaching onto both private properties.  The earth could fall into the crevasse and cause injury without warning.  Water washed away so much material that the open and visible sinkhole exceeds the 20' drainage easement in width.  The visible surface effects of the election not to maintain the drainage improvements extend to the public right-of-way Deep Water Way.  Both Lots 31 and 32 experience unstable and de-stabilized soils outside of the easement area itself.

To mitigate damage caused by the failure to maintain, remediation must include bank stabilization and an individual dredging plan to remove sediment from Brewer's Creek.  The failure of the total drainage improvement is so severe that the County should consider re-locating any new drainage improvements further west into Lot 31 given the natural contours of the land and the circumstances caused by the failed drainage outfall.

Whether or not the drainage system is replaced at the curb inlet, the failed RCP and FES must be removed from the sinkhole.  The pipe bedding must be replaced underneath the failed pipe sections culvert and the outfall structure. Once the pipes are replaced, the entire sinkhole is backfilled and compacted to previous design conditions.  The outfall to the ravine should also be backfilled and the rip-rap and geotextile fabric replaced. Once the area is backfilled, it should be seeded to prevent overland sheet flow from washing away the sediment.  The material that has washed away from the failure area has been deposited in the ravine and washed down to Brewer's Creek.  This material impedes the creek from draining and should be removed to allow water to evacuate the subdivisions served by the ravine.  This material is also reducing navigability of Brewer's Creek and should be removed.

Jack Claud
Assist. Dir. Private Development

SUBDIVISION OF
**BREWERS CREEK**





# EXHIBIT B



CRACKS IN
ROADWAY
AS OF
08-13-2021

DEEP WATER WAY

SINKHOLE FORMING
AS OF
08-13-2021

20' DRAINAGE EASEMENT

20' DRAINAGE EASEMENT

SINKHOLE FORMING
AS OF
04-21-2021

LOT 32
T.P. 34H-10-032
#205

LIMITS OF FAILURE

08-25-2021
08-13-2021
04-20-2021
03-02-2021
02-01-2021
12-30-2020
11-11-2020
03-13-2020

LOT 31
T.P. 34H-10-031
#207

EXISTING CREEK BED

0    20    40
Feet

Hoggard-Eure Associates, P.C.
ENGINEERS-SURVEYORS-PLANNERS
901 PortCentre Parkway, Suite 5
Portsmouth, Virginia 23704    757-484-9670

SCALE: 1" = 20'
DATE: 9/08/2021
DRAWN: B.A.I.
REVISED:
IOW SKETCH.dwg
3918.00

# EXHIBIT C



**Stewart Title & Settlement Services, Inc**
1434 Crossways Boulevard, Suite 290
Chesapeake, VA 23320
(757) 424-4400 main   (757) 420-7086 fax
annmiller@stewart.com

# TITLE REPORT

File Number:    999263                                                                    Date Issued:  November 9, 2020

The information contained in this report is issued to and for the benefit of The Law Firm of Joseph V. Sherman, PC

We have searched and examined the land records and tax records which impart constructive notice, of Isle of Wight County, Virginia for the period beginning 1988 and ending October 19, 2020 for the property described as:

207 Deep Water Way -- Tax Map #: 34H-01-031 - Lot 31 Resubdivision of Lots 30 & 31 Subdivision of Brewers Creek, Isle of Wight County, Virginia, Plat Cabinet 2, Slide 40, Page 5.

SOURCE DEED:

It being the same property conveyed to Brian A. Fernaays and Susan L. Fernaays, husband and wife by deed from Brewer's Creek, L.C., a Virginia limited liability company dated September 4, 1998 and duly recorded September 15, 1998 in the aforesaid Clerk's Office as Instrument Number 980004724.

CHAIN OF TITLE:

It being a part of the same property conveyed to Roger L. Cundiff by deed from Brewer's Creek, L.C., a Virginia limited liability company dated December 19, 1996 and duly recorded December 23, 1996 in the aforesaid Clerk's Office as Instrument Number 960005303. Conveys Lots 30 and 31 Brewers Creek as shown on plat recorded in Plat Cabinet 2, Slide 40, Page 5. Deed of Correction between Brewer's Creek, L.C., a Virginia limited liability company and Roger L. Cundiff, dated August 17, 1998 and duly recorded September 15, 1998 in the aforesaid Clerk's Office as Instrument Number 980004723. Roger L. Cundiff conveys to Brewer's Creek, L.C. Lot 31 as shown on plat recorded in Plat Cabinet 2, Slide 40, Page 5 and Brewer's Creek, L.C. conveys to Roger L. Cundiff Lot 30A as shown on plat recorded in Plat Cabinet 2, Slide 40, Page 5.

It being the a part of the same property conveyed to Brewer's Creek, L.C., a Virginia limited liability company by Deed in Dissolution from Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White, Michael Ford Carpenter and Lee Company, Inc., a Virginia corporation, being all the general partners of Southside Associates, a dissolved Virginia General Partnership, Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White and  Michael Ford Carpenter being all of the devisees of personal property under the will of Joseph E.Carpenter, deceased, and Joseph E. Carpenter, Jr., Michael Ford Carpenter and Michael E. Mares, Co-Administrators, c.t.a. of the Estate of Joseph E. Carpenter, deceased, dated December 18, 1995 and duly recorded March 29, 1996 in the aforesaid Clerk's Office in Deed Book 471 page 791. Conveys Lots 1, 3, 6, 11 through 26, 28 through 31, Lots 34, 35, 37, 39 through 43, 45, 46, 47, 48 and 50 Brewer (sic) Creek as shown on plat recorded in Plat Cabinet 1-375, Page 6.

It being a part of the same property conveyed to Brewer Creek Partnership, a Virginia general partnership by deed from Frederick J. Gregg, unmarried, dated September 2, 1987 and duly recorded November 18, 1987 in the aforesaid Clerk's Office in Deed Book 335 page 146. Conveys 70 acres. See plat book 14, pages 32 and 33 and Plat Cabinet 1, Slide 375, pages 5, 6 and 7.

205 Deep Water Way -- Tax Map #: 34H-01-032 - Lot 32 Subdivision of Brewers Creek, Isle of Wight County, Virginia, Plat Cabinet 1, Slide 375 Pages 5, 6 and 7.

SOURCE DEED:

It being the same property conveyed to Otis G. Brock, Jr. and Frances D. Brock, husband and wife by deed from Edward J. Parnell and Carrie S. Parnell, husband and wife, dated December 8, 1994 and duly recorded December 9, 1994 in the aforesaid Clerk's Office in Deed Book 448 page 279.

CHAIN OF TITLE:

It being the same property conveyed to Edward J. Parnell and Carrie S. Parnell, husband and wife by deed from Brewer Creek Partnership, a Virginia general partnership, dated May 15, 1989 and duly recorded May 16, 1989 in the aforesaid Clerk's Office in Deed Book 355 page 536. Jeffery B. Kelly, Substitute Trusee joins in to release Lot 32 from Deed of Trust from Brewer Creek Partnership and recorded in Deed Book 349, at page 436.

It being a part of the same property conveyed to Brewer Creek Partnership, a Virginia general partnership by deed from Frederick J. Gregg, unmarried, dated September 2, 1987 and duly recorded November 18,

1987 in the aforesaid Clerk's Office in Deed Book 335 page 146. Conveys 70 acres. See plat book 14, pages 32 and 33 and Plat Cabinet 1, Slide 375, pages 5, 6 and 7.

115 Deep Water Way -- Tax Map #: 34H-01-033 - Lot 33 Subdivision of Brewers Creek, Isle of Wight County, Virginia, Plat Cabinet 1, Slide 375 Pages 5, 6 and 7.

SOURCE DEED:

It being the same property conveyed to Rita J. Griffey, married by Deed of Gift from Richard K. Griffey, married, dated February 21, 2014 and duly recorded March 3, 2014 in the aforesaid Clerk's Office as Instrument Number 140000679.

CHAIN OF TITLE:

It being the same property conveyed to Richard K. Griffey and Rita J. Griffey, husband and wife by deed from Wade M. Medlin and Julie T. Medlin, husband and wife, dated October 1, 2003 and duly recorded October 3, 2003 in the aforesaid Clerk's Office as Instrument Number 030008097.

It being the same property conveyed to Wade M.Medlin and Julie T. Medlin, husband and wife by deed from Geraline C. Manning, married, dated October 23, 1996 and duly recorded October 28, 1996 in the aforesaid Clerk's Office as Instrument Number 960004449.

It being the same property conveyed to Geraline C. Manning, femme sole by deed from Meisner Construction, Inc., a Virginia corporation, dated September 12, 1989 and duly recorded September 13, 1989 in the aforesaid Clerk's Office in Deed Book 360 page 244. Deed of Correction from Meisner Construction, Inc., dated September 14, 1989 and duly recorded October 4, 1989 in the aforesaid Clerk's Office in Deed Book 361 page 126, correcting the legal description to include the language "together with the improvements thereon and thte appurtenances thereunto belonging".

It being the same property conveyed to Meisner Corporation (sic), Inc., a Virginia corporation by deed from Brewer Creek Partnership, a Virginia general partnership, dated April 18, 1989 and duly recorded April 20, 1989 in the aforesaid Clerk's Office in Deed Book 354 page 584. Jeffery B. Kelly, Substitute Trustee joins in to release Lot 33 from Deed of Trust from Brewer Creek Partnership and recorded in Deed Book 349, at page 436.

It being a part of the same property conveyed to Brewer Creek Partnership, a Virginia general partnership by deed from Frederick J. Gregg, unmarried, dated September 2, 1987 and duly recorded November 18, 1987 in the aforesaid Clerk's Office in Deed Book 335 page 146. Conveys 70 acres. See plat book 14, pages 32 and 33 and Plat Cabinet 1, Slide 375, pages 5, 6 and 7.

113 Deep Water Way -- Tax Map #: 34H-01-034 - Lot 34 Subdivision of Brewers Creek, Isle of Wight County, Virginia, Plat Cabinet 1, Slide 375 Pages 5, 6 and 7.

SOURCE DEED:

It being the same property conveyed to Trent R. Heath by Quitclaim Deed from Trent R. Heath and Cassie E. Heath, husband and wife, executed on April 23, 2020 and duly recorded April 30, 2020 in the aforesaid Clerk's Office as Instrument Number 200002101.

CHAIN OF TITLE:

It being the same property conveyed to Trent R. Heath and Cassie E. Heath, husband and wife by deed from Todd Builders, Inc., a Virginia corporation, dated November 27, 2017 and duly recorded December 1, 2017 in the aforesaid Clerk's Office as Instrument Number 170005245.

It being the same property conveyed to Todd Builders, Inc., a Virginia corporation by deed from Michael F. Carpenter, Manager and Trustee in Liquidation of Brewer's Creek, L.C., a cancelled Virginia limited liability company and Michael F. Carpenter, Nancy C. Wesson, Anne Carpenter, Lee C. Mitchell and Joseph E. Carpenter, Jr., each individually and as members of Brewer's Creek, L.C., a cancelled Virginia limited liability company, dated April 27, 2017 and duly recorded May 5, 2017 in the aforesaid Clerk's Office as Instrument Number 170001942. Conveys Lots 34, 37, 46 and 47 Brewer (sic) Creek as shown on plat recorded in Plat Cabinet 1-375, Page 6.

It being the part of the same property conveyed to Brewer's Creek, L.C., a Virginia limited liability company by Deed in Dissolution from Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White, Michael Ford Carpenter and Lee Company, Inc., a Virginia corporation, being all the general partners of Southside Associates, a dissolved Virginia General Partnership, Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White and Michael Ford Carpenter being all of the devisees of personal property under the will of Joseph E.Carpenter, deceased, and Joseph E. Carpenter, Jr., Michael Ford Carpenter and Michael E. Mares, Co-Administrators, c.t.a. of the Estate of Joseph E. Carpenter, deceased, dated December 18, 1995 and duly recorded March 29, 1996 in the aforesaid Clerk's Office in Deed Book 471 page 791. Conveys Lots 1, 3, 6, 11 through 26, 28 through 31, Lots 34, 35, 37, 39 through 43, 45, 46, 47, 48 and 50 Brewer (sic) Creek as shown on plat recorded in Plat Cabinet 1-375, Page 6.

It being a part of the same property conveyed to Brewer Creek Partnership, a Virginia general partnership by deed from Frederick J. Gregg, unmarried, dated September 2, 1987 and duly recorded November 18,

1987 in the aforesaid Clerk's Office in Deed Book 335 page 146. Conveys 70 acres. See plat book 14, pages 32 and 33 and Plat Cabinet 1, Slide 375, pages 5, 6 and 7.

108 Deep Water Way -- Tax Map #: 34H-01-000B containing 22,914 S.F.  Plat Showing Property for Pugh & Christian, LLC Located on March View Court Brewers Creek Subdivision,  Well Lot No. 1, Isle of Wight County, Virginia, Instrument Number 180000997.

SOURCE DEED:

It being the same property conveyed to Brian J. Neville and Renee C. Neville, husband and wife by deed from Robert G. Phillips and L. Michelle Phillips, husband and wife, dated October 15, 2019 and duly recorded October 21, 2019 in the aforesaid Clerk's Office as Instrument Number 190004479.

CHAIN OF TITLE:

It being the same property conveyed to Robert G. Phillips and L. Michelle Phillips, husband and wife by deed from Pugh & Christian, LLC, a Virginia limited liability company, dated January 8, 2019 and duly recorded January 9, 2019 in the aforesaid Clerk's Office as Instrument Number 190000090.

It being a part of the same property conveyed to Pugh & Christian, LLC, a Virginia limited liability company  by deed from C & P Isle of Wight Water Co., a Virginia corporation, dated April 12, 2012 and duly recorded May 15, 2012 in the aforesaid Clerk's Office as Instrument Number 120002278. Conveys Well Lot 1 Brewers Creek and Well Lot 2 and Well Lot 3A of Ashby Phase 1A.

It being the same property conveyed to C & P Isle of Wight Water Co., a Virginia corporation by deed from Brewer's Creek, L.C., a Virginia limited liability company, dated February 5, 1997 and duly recorded February 18, 1997 in the aforesaid Clerk's Office as Instrument Number 970000662. * TOGETHER WITH entire water supply facilities and system now owned by the Grantor. ** TOGETHER WITH easements of right-of-way located over, under, across and through property shown on Plat Cabinet 1, Slide 375, pages 5 through 7.

It being the same property conveyed to Brewer's Creek, L.C., a Virginia limited liability company by Deed in Dissolution from Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White, Michael Ford Carpenter and Lee Company, Incorporated., a Virginia corporation, being all the general partners of Southside Associates, a dissolved Virginia General Partnership, Cynthia Lee Carpenter Mitchell, Joseph E. Carpenter, Jr., Nancy Carolyn Carpenter Wesson, Mildred Anne Carpenter-White and  Michael Ford Carpenter being all of the devisees of personal property under the will of Joseph E.Carpenter, deceased, and Joseph E. Carpenter, Jr., Michael Ford Carpenter and Michael E. Mares, Co-Administrators, c.t.a. of the Estate of Joseph E. Carpenter, deceased, dated December 20, 1996 and duly recorded February 18, 1997 in the aforesaid Clerk's Office as Instrument Number 970000661. * TOGETHER WITH entire water supply facilities and system now owned by the Grantor. ** TOGETHER WITH easements of right-of-way located over, under, across and through property shown on Plat Cabinet 1, Slide 375, pages 5 through 7.

It being a part of the same property conveyed to Brewer Creek Partnership, a Virginia general partnership by deed from Frederick J. Gregg, unmarried, dated September 2, 1987 and duly recorded November 18, 1987 in the aforesaid Clerk's Office in Deed Book 335 page 146. Conveys 70 acres. See plat book 14, pages 32 and 33 and Plat Cabinet 1, Slide 375, pages 5, 6 and 7.

23217 Oyster Court -- Tax Map #: 43A-12-004 Lot 4 containing 3.422 acres, Subdivision Plat of the property of Holladay Estates, Inc., a Virginia corporation (Deed Book 453, Page 713) to be known as Oyster Way, Isle of Wight County, Virginia, Plat Cabinet 2, Slide 35, Page 18.

SOURCE DEED:

It being the same property conveyed to Daniel A. Price and Robin Price by deed from Wells Fargo Bank, National Association as Trustee under Pooling and Servicing Agreement dated as of August 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-HE1 Mortgage Pass-Through Certificates, Series 2006-HE1, dated February 4, 2009 and duly recorded February 10, 2009 in the aforesaid Clerk's Office as Instrument Number 090000653.

CHAIN OF TITLE:

It being the same property conveyed to Wells Fargo Bank, National Association as Trustee under Pooling and Servicing Agreement dated as of August 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-HE1 Mortgage Pass-Through Certificates, Series 2006-HE1by Trustees Deed from Professional Foreclosure Corporation of Virginia, Substitute Trustee, dated May 23, 2008 and duly recorded June 17, 2008 in the aforesaid Clerk's Office as Instrument Number 080003293.

It being the same property conveyed to Robert Williams and Lisa Williams, husband and wife by deed from Daniel M. Saccone and Catherine E. Saccone, husband and wife, dated July 23, 2003 and duly recorded August 8, 2003 in the aforesaid Clerk's Office as Instrument Number 030006349.

It being the same property conveyed to Daniel M. Saccone and Catherine E. Saccone, husband and wife by deed from Holladay Estates, Inc., a Virginia corporation, dated October 30, 1998 and duly recorded November 2, 1998 in the aforesaid Clerk's Office as Instrument Number 980005716.

It being a part of the same property conveyed to Holladay Estates, Inc., a Virginia corporation by deed from Agnes Nelson Holladay, widow, by her Attorney-in-Fact Bessie Berryman Scott and Robert F.

Apperson pursuant to that certain Power of Attorney, dated August 28, 1987 and recorded in Deed Book 451, at page 719, dated February 24, 1995 and duly recorded February 27, 1995 in the aforesaid Clerk's Office in Deed Book 451 page 721. Re-recorded on April 13, 1995 at Deed Book 453, at page 713. Conveys 33 acres, more or less.

It being a part of the same property conveyed to Robert L. Holladay, Jr. by deed from Robert L. Holladay, Sr. and Elizabeth V. Holladay, his wife, dated May 25, 1937 and duly recorded February 15, 1938 in the aforesaid Clerk's Office in Deed Book 113 page 119. The said Robert L. Holladay, Jr. departed this life on January 7, 1972 and by his will recorded in Will Book 38, at page 338 he devised the property to Agnes Nelson Holladay, his wife.

23223 Oyster Court -- Tax Map #: 43A-12-003 Lot 3 containing 1.555 acres, Subdivision Plat of the property of Holladay Estates, Inc., a Virginia corporatoin (Deed Book 453, Page 713) to be known as Oyster Way, Isle of Wight County, Virginia, Plat Cabinet 2, Slide 35, Page 18.

SOURCE DEED:

It being the same property conveyed to Charles Robert Wright and Jean Miller Wright, Trustees of the Charles Robert Wright and Jean Miller Wright Joint Revocable Living Trust under Agreement dated May 10, 2018 by deed from Charles R. Wright and Jean M. Wright, husband and wife, dated May 10, 2018 and duly recorded May 11, 2018 in the aforesaid Clerk's Office as Instrument Number 180001745.

CHAIN OF TITLE:

It being the same property conveyed to Charles R. Wright and Jean M. Wright, husband and wife by deed from Thomas Michael Heider, unmarried, dated January 17, 2001 and duly recorded February 22, 2001 in the aforesaid Clerk's Office as Instrument Number 010000489.

It being the same property conveyed to Thomas Michael Heider by Quitclaim Deed from Tracy Ann Heider and Thomas Michael Heider, her former husband, dated October 23, 2000 and duly recorded November 17, 2000 in the aforesaid Clerk's Office as Instrument Number 000005162.

It being the same property conveyed to Thomas M. Heider and Tracy Ann Heider, husband and wife by deed from Holladay Estates, Inc., a Virginia corporation, dated December 20, 1996 and duly recorded December 27, 1996 in the aforesaid Clerk's Office as Instrument Number 960005329.

It being a part of the same property conveyed to Holladay Estates, Inc., a Virginia corporation by deed from Agnes Nelson Holladay, widow, by her Attorney-in-Fact Bessie Berryman Scott and Robert F. Apperson pursuant to that certain Power of Attorney, dated August 28, 1987 and recorded in Deed Book 451, at page 719, dated February 24, 1995 and duly recorded February 27, 1995 in the aforesaid Clerk's Office in Deed Book 451 page 721. Re-recorded on April 13, 1995 at Deed Book 453, at page 713. Conveys 33 acres, more or less.

It being a part of the same property conveyed to Robert L. Holladay, Jr. by deed from Robert L. Holladay, Sr. and Elizabeth V. Holladay, his wife, dated May 25, 1937 and duly recorded February 15, 1938 in the aforesaid Clerk's Office in Deed Book 113 page 119. The said Robert L. Holladay, Jr. departed this life on January 7, 1972 and by his will recorded in Will Book 38, at page 338 he devised the property to Agnes Nelson Holladay, his wife.

PERPETUAL AND EXCLUSIVE RIGHT, PRIVILEGE AND EASEMENT OF RIGHT-OF-WAY FOR A WATER SUPPLY FACILITY AND SYSTEM ALONG AND WITHIN THE 50' RIGHT-OF-WAY FOR THE ROADS WITHIN BREWERS CREEK SUBDIVISION:

SOURCE DEED:

It being the same property conveyed to Isle of Wight County, Virginia by deed from C & P Isle of Wight Water Co., a Virginia corporation, dated December 1, 2011 and duly recorded December 5, 2011 in the aforesaid Clerk's Office as Instrument Number 110004906. Several Parcels.

CHAIN OF TITLE:

It being the same property conveyed to C & P Isle of Wight Water Co., Inc., a Virginia corporation by deed from Brewers Creek Partnership, dated October 30, 1995 and duly recorded December 12, 1995 in the aforesaid Clerk's Office in Deed Book 466 page 419.

It being the same property conveyed to C & P Isle of Wight Water Co., Inc., a Virginia corporation by deed from Brewers Creek Partnership, dated October 30, 1995 and duly recorded December 12, 1995 in the aforesaid Clerk's Office in Deed Book 466 page 421. Conveys Well Lot 1 Brewers Creek.

Well Lot No. 2 Tax Map #: 34H-01-000A Cedar Grove Rd:

SOURCE DEED:

It being the same property conveyed to Stephen E. House and Karen B. House, husband and wife by deed from Isle of Wight County, Virginia, dated October 15, 2020 and duly recorded October 16, 2020 in the aforesaid Clerk's Office as Instrument Number 200006092.

CHAIN OF TITLE:

It being the same property conveyed to Isle of Wight County, Virginia by deed from C & P Isle of Wight Water Co., a Virginia corporation, dated December 1, 2011 and duly recorded December 5, 2011 in the aforesaid Clerk's Office as <u>Instrument Number 110004906</u>. Several Parcels.

See below

TAX STATUS:

The property is subject to the following matters:

1.  Terms, provisions, covenants, conditions and restrictions, easements, charges, assessments and liens provided in the Covenants, Conditions and Restrictions recorded in <u>Deed Book 354, at Page 20</u>, but omitting any covenant, conditions or restrictions, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title-42 of the United States Code, or (b) relates to handicap, but does not discriminate against handicapped persons. (Brewers Creek)

2.  Terms, provisions, covenants, conditions and restrictions, easements, charges, assessments and liens provided in the Covenants, Conditions and Restrictions recorded as <u>Instrument Number 960003562</u> and Amended in <u>Instrument Number 970004505</u>, but omitting any covenant, conditions or restrictions, if any, based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title-42 of the United States Code, or (b) relates to handicap, but does not discriminate against handicapped persons. (Oyster Way)

3.  Easement granted Virginia Electric and Power Company, as established, reserved, shown by instrument recorded in <u>Deed Book 353, Page 878</u>. (Brewers Creek)

4.  Easement granted Virginia Electric and Power Company, as established, reserved, shown by instrument recorded in <u>Deed Book 353, Page 875</u>. (Brewers Creek - Reserved Lot, Well Lot and Lots 35, 36 and 37)

5.  Easement granted Virginia Electric and Power Company, as established, reserved, shown by instrument recorded as <u>Instrument Number 960003312</u>. (Holladay Estates)

6.  Deed of Easement dated October 30, 1995 by and between Brewers Creek Partnership and C & P Isle of Wight Water Co., Inc., a Virginia corporation recorded in <u>Deed Book 466 at Page 419</u>.

7.  Well Dedication from Brewers Creek Partnership by deed dated October 29, 1991 and recorded in <u>Deed Book 389, at page 383</u>.

8.  Notice for Recordation: AOSS Operation and Maintenance Required from Mason Hoggard, Environmental Health Specialist, Sr. to Robert G. Phillips, dated October 8, 2019 and recorded as <u>Instrument Number 190004262</u>. (Tax Map #: 34H-01-000B)

9.  Matters as shown on plat entitled Subdivision Plat of the Property of Holladay Estates, Inc., a Virginia corporation (<u>Deed Book 453, Page 713</u>) to be known as Oyster Way, Newport Magisterial District, Isle of Wight County, Virginia and recorded in <u>Plat Cabinet 2, Slide 35, Page 18</u>.

10. Matters as shown on plat entitled Plat Showing Property for Pugh & Christian, LLC Located on Marsh View Court Brewers Creek Subdivision, Well Lot No. 1, Newport Magisterial District, Isle of Wight County, Virginia and recorded as <u>Instrument Number 180000997</u>. (Tax Map #: 34H-01-000B)

11. Matters as shown on plat entitled Subdivision of Brewers Creek Newport Magisterial District, Isle of Wight County, Virginia and recorded in <u>Plat Cabinet 1, Slide 375, pages 5, 6 and 7</u>.

12. Matters as shown on plat entitled Plat Showing Survey of Property of R. L. Holladay Estate, Isle of Wight County, Virginia and recorded in <u>Plat Cabinet 1, Slide 365, page 32 and 33</u> and as shown on plat recorded in <u>Plat Book 14, pages 32 and 33</u>.

13. Matters as shown on plat entitled Plat Showing Resubdivision of Lots 30 and 31 Subdivision of Brewers Creek Isle of Wight County, Virginia and recorded in <u>Plat Cabinet 2, Slide 40, page 5</u>.

**14. NOTE: DEEDS OF TRUST, JUDGMENTS, UCC-1 AND TAXES WERE NOT SEARCHED.**

THIS IS NOT TITLE INSURANCE:  This report only provides title information contained in the above stated records and does NOT reflect unindexed or misindexed matters or off record matters that may affect said land.  This Company, in issuing this report assumes no liability on account of any instrument or proceedings in the chain of title to the property which may contain defects that would render such instrument or proceedings null and void or defective.  All instruments in the chain of title to the property are assumed to be good and valid.  This report is not a commitment to insure and therefore does not contain the requirements which would appear in a title policy.

The Company's liability for this report is limited to the amount paid for this report and extends only to the party to which it is issued.  No other party may rely on this report.  This report contains no express or implied opinion warranty, guarantee, insurance or other similar assurances as to the status of title to the land.

**Stewart Title & Settlement Services, Inc**

BY: *Patricia E. Raper*
_____

# EXHIBIT D



October 7, 2021

Sue & Brian Fernaays          Mr. Otis Brock
207 Deep Water Way            205 Deep Water Way
Carrollton, VA 23314          Carrollton, VA 23314

RE:     Fernaays and Brock v. Isle of Wight County; 2:21-cv-99

Dear Mr. and Mrs. Fernaays and Mr. Brock,

The purpose of the following assessment is to identify impacts to your properties arising from the dedicated drainage easement encumbrances on your properties which the County refuses to maintain.

Any licensed realtor involved in an attempt to sell your properties would be required to disclose any known material adverse facts to the buyer, be it your realtor as seller (Code of Virginia Section 54.1-2131) or the buyer's own agent (Code of Virginia Section 54.1-2132). Given that the easement is readily apparent on the plat for both of your properties, it is not reasonable or probable that any realtor doing their due diligence would fail to become aware of the easement. Likewise, any buyer doing their due diligence would discover the existence of the easement when surveying the property. Accordingly, anyone you attempt to sell your property to should become aware of the sinkhole encumbering your properties during the process. By law I am required to disclose the existence of the sinkhole.

The drainage easement that is not maintained is now and open sinkhole and an adverse easement impairing the marketability and salability of your properties. With the easement open as a sinkhole, your properties stand to face extended exposure time in order to make a sale without making a significant concession on the price. This is particularly true given the many properties located in your subdivision and the county that are not encumbered by a drainage easement maintained as an open sinkhole.

Beyond the existence of the easement itself, the subsidence on your properties caused by this easement greatly diminishes the salability of your properties. Market participants do not like property with adverse easements much less adverse easements with uncertain conditions. Both of your properties are gradually washing away and the problem approaches the public street. Furthermore, the subsidence is washed into the boat slip on the property owned by the Fernaays which you report affects navigability without dredging. I am not aware of how you will remedy these conditions without help from agencies like VDOT, the County, and the Army Corps of Engineers. These defects likewise require disclosure.

If you should have any questions or wish to discuss, I would be pleased to meet with you again.

Sincerely,

*Nanette Criddle*

Nanette Criddle, REALTOR



# EXHIBIT E

*APPRAISAL CONSULTATION GROUP*

5511 Princess Anne Road
Virginia Beach, Virginia 23462
(757) 497-1229   FAX (757) 497-1438

October 7, 2021

Otis Brock
205 Deep Water Way
Carrollton, VA 23314

Re:     Sinkhole and failure to maintain drainage easement

Dear Mr. Brock:

Please accept the enclosed report as an updated appraisal report of the above identified property before and after the sinkhole caused by Isle of Wight County's failure to maintain a drainage easement.  New information may cause certain changes to my analyses.  My opinions of value may change as well depending on rulings in your case or the discovery of more information.

To the best of my knowledge this appraisal has been prepared in compliance with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) as adopted by the Appraisal Foundation, and the Code of Professional Ethics of the Appraisal Institute. This report is to be used to assist you in making decisions in evaluating the impact of the failure by the County to maintain the existing drainage easement and its improvements.

Otis Brock
October 7, 2021
Page 2

This report reflects the property's size as 1.07 acres consistent with public records.  Based on the data and analysis in this report, it is my opinion that the difference in market values before and after the impact, subject to the assumptions and Statement of Limiting Conditions was $75,000 as of the date of the filing of your lawsuit, February 23, 2021.

Thank you for this opportunity to be of service to you.

Respectfully submitted,

Dennis W. Gruelle, MAI, SRA
Virginia Certified General
Real Estate Appraiser #4001001489

**APPRAISAL OF REAL PROPERTY**

205 Deep Water Way
Carrollton, VA 23314

PREPARED FOR

Otis Brock

PREPARED BY

Dennis W. Gruelle MAI, SRA
Appraisal Consultation Group

**DATE OF OPINION OF VALUE**

February 23, 2021

**Date of Report**

October 7, 2021

## EXECUTIVE SUMMARY

**Location:**               205 Deep Water Way, Carrollton, VA 23314

**Intended User:**          Otis Brock

**Intended Use:**           For the purpose of assisting the client in evaluating the impacts
                            of the County refusing to maintain an existing drainage easement

**Property Rights**
  **Appraised:**            Fee Simple Rights

**Zoning:**                 single-family residential

**Highest & Best Use - Before**

**As If Vacant:**           Development for residential uses

**As Improved:**            Single-family residential use

**Highest & Best Use - After**

  **As If Vacant:**         Inferior residential development

  **As Improved:**          Inferior single-family residential use

**Date of Valuation:**       February 23, 2021

**Date of Report:**         October 7, 2021

**Exposure Time:**          30 – 45 days

**Final Opinion of Value Before:**        $350,000
**Value After:**                          $275,000
**Difference:**                            $75,000

1

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to provide an opinion of the fair market value of the fee simple interest in the subject property immediately prior to the litigation (Before Value) without regard to the sinkhole, and an opinion of the fair market value after considering the sinkhole as of the same date.  I have assumed that the County and/or VDOT will not make repairs and prefer to leave the drainage easement open and expanding consistent with this existing state ongoing for two to three years.

## DEFINITION OF VALUES USED IN THIS REPORT

**Fair market value** is "what a willing buyer would pay in cash to a willing seller at the time of taking."

Source:  Kirby Forest Industries, Inc. v. United States 468 US 1 (1984)

**Legal Definition of Market Value** as used is this report is defined by the Commonwealth of Virginia as follows:

> "The price which one, under no compulsion, is willing to take for a property which he has for sale, and for which another, under no compulsion, being desirous and able to buy, is willing to pay for the article."

Source: Talbot vs. Norfolk, 158 Va. 387, 391. (1932).

These two definitions are considered to be synonymous for the purposes of this report.

**Fee Simple** is defined by The Dictionary of Real Estate Appraisal, Fifth Edition as:

> "An absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

**Easement Rights** as used herein is defined as: "An interest in real property that transfers use, but not ownership, of a portion of an owner's property. Access or right-of-way easements may be acquired by private parties or public utilities. Governments accept conservation, open space and preservation easements on private property." (*The Appraisal of Real Estate,* 14th Edition, Page 117, published by the Appraisal Institute.)

## DESCRIPTION FOR IDENTIFICATION

The subject property contains 1.07 acres of land fronting Deep Water Way in Carrollton, Virginia.  The Tax identification number is 34H-01-032.

## OWNERSHIP & PROPERTY HISTORY

The property is owned by Otis Brock.  The property has not been bought or sold in the last fifteen years.

## COMPLIANCE

This appraisal report is intended to conform with the minimum standards set forth in Standards 1 and 2 of the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Standards Board of the Appraisal Foundation.

## EXPOSURE TIME ANALYSIS

As required by the Uniform Standards of Professional Appraisal Practice, when estimating market value, an appraisal should be specific as to the estimate of exposure time linked to the value estimate.

The difference between exposure time and marketing time is the time frame of analysis. Exposure time considers that period preceding the effective date of appraisal, whereas marketing time is that period immediately after the effective date of appraisal.

In the past, real estate markets have been observed to be cyclical.  The demand for real estate ebbs and flows with national, regional and local economies and is constantly in competition with alternative investment vehicles provided through the financial markets. As demonstrated by the several sales summarized in this report there is demand for this property type, if priced competitively. In consideration of the foregoing, it is estimated that an exposure time of thirty (30) to forty-five (45) days is reasonable for the subject property given the market activity as of the date of take.

## SCOPE OF THE APPRAISAL

The scope of this appraisal assignment includes the necessary research and analysis to prepare this report in accordance with its intended use and the *Uniform Standards of Professional Appraisal Practice (USPAP)* of the Appraisal Institute. With regard to the subject property, this involved the following steps:

1)      The subject property was inspected by Dennis Gruelle on multiple occasions in 2021.

2)      Regional and neighborhood data were based on information available regarding the market and a physical inspection of the area.

3)      The subject property data was based on a physical inspection and information provided by the owner as well as public records.

4)      In estimating the highest and best use of the property, an analysis was made of the market, data compiled through research in the marketplace, comparable sales activities, conversations with knowledgeable builders, brokers, public officials, and others.

5)      In developing the approaches to value, the market data used was collected from our office files, other appraisers, brokers, property owners, and other persons knowledgeable about the subject market and the subject property's market segment. The sales comparison approach was developed as this approach is considered most applicable to this appraisal problem.

6)      Public records and broker discussions were relied upon regarding comparable sales physical characteristics.

7)      After assembling and analyzing the data defined in this scope of the appraisal, a final opinion of market value before was made. I relied on research and broker interviews to develop a final opinion of value for the subject property. I relied on market data, study sales, my experience, interviews with brokers, developers, appraisers, appraisal reports and market participants to determine the impact the taking would have on the subject property.  I also considered text books, course materials and teaching materials published by nationally recognized appraisal organizations, including the International Right of Way Association and The Appraisal Institute including Donnie Sherwood's "The Valuation of Easements" article as published in the November/December 2014 issue of *Right of Way Magazine*;. Other documents considered include: deeds and related land records; surveys, plats, plans, pictures, images or other documents depicting or showing comparable properties; surveys, plats, plans, pictures, images or other documents depicting or showing the location and growth of the sinkhole on the properties; documents including correspondence and communications; documents describing the construction activities and construction timeline in connection with the construction bank stabilization and dredging required as a result of the sinkhole; articles and publications listed in the addenda of this report. The opinions and conclusions developed in this report are considered reasonable and market based.

8)      Hoggard-Eure's survey exhibit showing the sinkhole growth dated September 8, 2021, were reviewed to determine the extent of the sinkhole effects and are incorporated by reference.  The appraiser also reviewed the Court's docket including the complaint filed.

9)      This is an appraisal report which is intended to comply with the reporting requirements set forth under the Standards Rule 2-2 (a) of the *Uniform Standards of Professional Appraisal Practice*.  The depth of discussion contained in this report is specific to the needs of the client and intended use as stated herein.

## STATEMENT OF LIMITING CONDITIONS

- I assume no responsibility for legal matters affecting the property or the title thereto; nor do I render any opinion as to the title, which is assumed to be good and marketable.

- The property is appraised as though free and clear, under responsible ownership, and competent management, unless otherwise indicated.

- Any photographs or sketches included are to aid the reader in visualizing the property.

- The information on which this appraisal is based has been obtained from sources normally used by Appraisal Consultation Group and is considered to be reliable, but is in no sense guaranteed.

- I am not required to give testimony or appear in court because of having made this appraisal with reference to the property in question, unless arrangements have been previously made. The fee charged for this appraisal does not include payment for court testimony or for further consultation.

- No inspection for termite damage was made and no responsibility has been assumed in connection with this matter.

- No tests have been made by the appraiser to determine load bearing qualities, percolation, subsoil conditions, or drainage conditions and no consideration has been given to the requirements regarding flood insurance for loan purposes.

- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. This report assumes that the improvements will be in compliance with the requirements of ADA.

- For the purposes of evaluating this property, the value conclusion in this report expressly assumes that there are no current or potential major structural concerns with the subject property. Any expenses incurred with remedial action would impact the opinion of value.

- The appraiser assumes there are no hidden or unapparent conditions of the property, subsoil or otherwise, which would render it more or less valuable other than those listed in the extraordinary assumptions.

- Economic projections in this report assume a level economy and the value stated is in United States currency as of the effective date of this appraisal.

- I have relied on information provided by others. This information is assumed to be true and correct; however, we reserve the right to alter the value conclusion if the information proves to have inaccuracies, is incomplete, or if pertinent information has been withheld.

- Disclosure of the contents of this appraisal is governed by the Bylaws and Regulations of the professional organizations with which the appraisers are affiliated.

- Acceptance of and/or use of this report constitutes agreement with these terms and conditions.

- The whole property size is based upon provided information and public records. Should this information not be correct I reserve the right to update this report.

### EXTRAORDINARY ASSUMPTIONS AND DISCLOSURES

An extraordinary assumption is defined by USPAP to be "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions". Extraordinary assumptions presume as fact otherwise uncertain information. In other words, this type of assumption involves uncertainty about an underlying premise. An example is a survey that displays a lot size. If the lot size is later found to be much smaller, then the value conclusion may be affected.

USPAP Standard Rule 1-2(f) requires the identification of all extraordinary assumptions that are necessary for credible assignment results. This appraisal employs the following extraordinary assumptions.

- Features of the subject site such as size, dimensions, etc. were obtained from the public records, the client and their legal representatives. Information provided is assumed to be reasonably correct. Changes would have an impact on value.

- Observation of the subject property included walking over portions of the property. It is assumed that the subject has no hidden defects. No probes or attempts to remove materials to discover unapparent defects were made by the appraiser.

- I have assumed that the County and/or VDOT own the drainage easement at issue in this matter. If a private party owns the drainage easement the valuation information in this report is not subject to change necessarily although the report would require certain corrections. I reviewed the title report of Patricia Raper.

- I have assumed that the Court will determine the date of take to be the date that the clients filed suit in court. It is my understanding that the client tried to get the County and VDOT to take responsibility and both entities refused. The date of the court filing represents the date of certainty that the governmental entities did not intend to fix, repair, or otherwise maintain the drainage easement. If the Court or jury determines a different date of take that would impact valuation.

The above extraordinary assumptions as well as other assumptions anywhere herein are integral premises upon which the conclusions in this document are based. If any of these assumptions are later found to be untrue or inaccurate, then this report's assignment results may be affected.

## RESTRICTIONS UPON DISCLOSURE AND USE

Neither all nor any part of the contents of this report (especially any conclusions as to value, identity of the appraisers or firm with which they are connected or any reference to the Appraisal Institute or the MAI designation) shall be disseminated to the public through the advertising media or any other public means of communication without the prior written consent and approval of Appraisal Consultation Group.

## CARROLLTON AREA DATA

The subject property is located in Carrollton area of Isle of Wight County.  This area of the Tidewater region is popular for residential use as it is rural, proximate to rural recreational uses like boating, fishing, and hunting.  The area offers water access, privacy, and natural scenery. The area accesses larger markets in Newport News by the Route 17 bridge and in Suffolk and Norfolk via Route 164.  The area is popular for residential uses given its reasonable commute.

## MARKET AREA ANALYSIS

A market area is defined by the *Dictionary of Real Estate Appraisal*, Fifth Edition as "The area associated with a subject property that contains its direct competitors."  A neighborhood is defined by the Thirteenth Edition of *The Appraisal of Real Estate* as a grouping of complementary land uses, which exhibits a greater degree of uniformity than a larger area. Neighborhoods are defined by environmental, social, governmental and economic forces, as well as physical characteristics, and are perceived to be relatively uniform.  A neighborhood may also reflect shared features such as similar building types and styles, population characteristics, economic profiles of occupants and zoning regulations that affect land use, rent and occupancy levels, the credit strength of occupants and ages of the buildings.  The purpose in defining and describing a neighborhood is to determine factors, which influence property values.  Probable trends are also considered.  Isle of Wight County is rural with areas devoted to residential uses as well as a significant amount of cropland and woodland areas.  The northern portion of the County experienced a lot of growth, and continues to grow, given its rural appeal to residential uses and simple commute to major markets using Route 17 and Route 164.  The subject property is located off of Route 17 within minutes of the James River Bridge and Newport News.  The submarket reveals consistent market activity of improved sales used for residential uses.

## SITE DESCRIPTION

The following information is based upon public records for the property as well as physical inspections and information obtained from the owner. The subject is located at Deep Water Way.

**Location:**                              205 Deep Water Way in Carrollton, VA.

**Size and Shape:**                  The parcel is irregular in shape and 1.07 AC.

| | |
|---|---|
| **Frontage:** | The property has frontage on Deep Water Way. |
| **Topography:** | The property includes cleared land and some rolling terrain. |
| **Utilities:** | Electric, telephone, and water. |
| **Zoning:** | SR – single-family residential. |
| **Land Use:** | Single-family residential. |
| **Access and  Visibility:** | Access and visibility from Deep Water Way. |
| **Summary:** | The subject site is well situated for residential uses. |

### HIGHEST AND BEST USE OF THE PROPERTY BEFORE

Highest and best use of land or a site as though vacant is defined in *The Dictionary of Real Estate Appraisal*, (5th Edition) as:

> probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.

Where a site has existing improvements, the highest and best use for the land as if vacant may be different from the existing use. For this reason, land is valued on the basis of its highest and best use as though vacant and available for development to its most economic use. The existing use will continue, however, until the land value as if vacant exceeds the total value of the property in its existing use.  The four key tests to the highest and best use of any property are 1) physically possible, 2) legally permissible, 3) financially feasible, and 4) maximally productive.

<u>**Highest and Best Use As If Vacant:**</u>

**Physically possible -** In order for any use to be considered, it must be physically possible to develop that use on the site. The subject site contains 1.07 acres and is bordered by a ravine.

**Legally Permissible:** The subject is currently SR for single-family residential uses.  A use other than residential use is not considered reasonable and probable.

**Financially Feasible:**  The subject property is located an area that is residential.

**Maximally Productive -** Of the uses which are physically possible, legally permissible and financially feasible, that use which provides the greatest return is considered to be the maximally productive use and the highest and best use. I have concluded that the highest and best use of the subject as vacant is for high-end residential development.

**Highest and Best Use - As Improved:**   The subject property is improved with a 2,406 SF house built in 1999.  I inspected the building and observed all of the site improvements and work, including landscaping, and driveway.   The subject property is marketable for single-family residential use and there is an immediate market in the Carrollton submarket for this use.   To consider its highest and best use, the appraiser determined there were local sales for use in comparison.   The appraiser inspected the improvements which indicate they are market ready.

## APPROACHES TO VALUE OF PROPERTY BEFORE PROJECT

The best use of the property is for sale for residential use.   Property is valued by application of the three standard approaches to value: Cost Approach, Income Approach and Sales Comparison Approach. All three approaches have been considered; however, the Sales Comparison Approach has been developed in arriving at a value estimate for the subject property.

The Sales Comparison or Market Data Approach is a systematic process of comparing properties which have sold to the property being appraised. This approach involves going directly into the marketplace and accumulating information on sales of properties judged to be comparable to the property under analysis. The data is reduced to a common denominator, or in appraisal terminology, unit of comparison which, when applied to the subject, gives an indication of market value. This approach has been utilized for the land valuation.

The Cost Approach is used to value improvements. The principle of substitution is basic to the Cost Approach. The principle affirms that no prudent investor or buyer would pay more for a property than the amount for which the site can be acquired and for which improvements that have equal desirability and utility can be constructed without undue delay. This approach was not utilized given the amount of sales of similar properties for similar uses nearby.

In the Income Approach, net income is translated into a value indication through capitalization. The net income that the property is capable of producing is divided by the appropriate capitalization rate applicable to market conditions.  This approach to value is created by the expectation of benefits to be derived in the future, namely, net income. This approach has not been developed to appraise the whole property there is not an active rental market.

This assignment involves an easement for drainage not maintained by any public or private entity. As such, it is necessary to quantify and allocate the value of the property after to determine if the public use causes damage to the private property value.  The Sales Comparison Approach is the best method to address the current appraisal problem and was utilized to study the market, appraise the value of the whole property before impact of the sinkhole, and value the whole property after impacts of the sinkhole.

## IMPROVED SALES COMPARISON

The sales comparison is the most common technique for valuing improved residential sales and is the preferred method when comparable sales are available. To apply this method, sales of similar properties are analyzed, compared, and adjusted to produce a value indication for the property being appraised. In the comparison process, the similarity or dissimilarity of the sale is considered.  There have been several sales in the market and this report includes sales which offer the most comparability in location, date of sale, and features.  Once sales are collected and reduced to a unit of comparison, adjustments are made for differences between market sales and the subject property. After analysis of the sales, the appraisers place the most credence on the most similar sales and from the reconciliation of these sales, a final value estimate is determined. The following sales used to estimate the value for the subject are reported on the following pages:

| Sale #: | Date | Sales Price | Location | Size | $/SF |
|---------|------|-------------|----------|------|------|
| 1 | 10/21/19 | $325,000 | 108 Marsh View Court | 1,900 | 171 |
| 2 | 10/29/20 | $280,000 | 418 Brewers Creek Lane | 2,752 | 102 |
| 3 | 10/14/20 | $315,000 | 205 Marsh View Court | 2,056 | 153 |
| Subject | 2/1/21 | | 205 Deep Water Way | | |

**Improved Comparable 1**

| | |
|---|---|
| **Location:** | 108 Marsh View Court |
| **Parcel #:** | 34H-01-000B |
| **Grantor:** | Robert G. & L. Michelle Phillips |
| **Grantee:** | Brian J. & Renee C. Neville |
| **Date:** | 10/21/2019 |
| **Zoning:** | SR |
| **Utilities:** | electric, telephone, water, and septic. |
| **Improved Size:** | 1,880 square feet |
| **Lot Size:** | .5260 AC |
| **Consideration:** | $325,000 |

**Improved Comparable 2**

| | |
|---|---|
| **Location:** | 418 Brewers Creek Lane |
| **Parcel #:** | 43A-04-034 |
| **Grantor:** | Billy P. & Suzanne Joyner |
| **Grantee:** | Cynthia Alexander |
| **Date:** | 10/29/2020 |
| **Zoning:** | SR |
| **Utilities:** | electric, water, telephone, and septic |
| **Improved Size:** | 2,752 square feet |
| **Consideration:** | $280,000 |

**Improved Comparable 3**

| | |
|---|---|
| **Location:** | 205 Marsh View Court |
| **Parcel #:** | 34H-01-050 |
| **Grantor:** | Teddy R. & Barbara A. Tyner |
| **Grantee:** | Jeremy L. & Tyalee S. Mills |
| **Date:** | 10/14/2020 |
| **Zoning:** | SR |
| **Utilities:** | electric, water, telephone, and septic |
| **Improved Size:** | 2,056 square feet |
| **Consideration:** | $315,000 |

13

## SALES COMPARISON APPROACH – BEFORE

## SUMMARY OF SALES DATA

| Sale #: | Date | Sales Price | Location | Size | $/SF |
|---------|------|-------------|----------|------|------|
| 1 | 10/21/19 | $325,000 | 108 Marsh View Court | 1,900 | 171 |
| 2 | 10/29/20 | $280,000 | 418 Brewers Creek Lane | 2,752 | 102 |
| 3 | 10/14/20 | $315,000 | 205 Marsh View Court | 2,056 | 153 |
| Subject | 2/1/21 | | 205 Deep Water Way | | |

The above grid summarizes the data presented in the improved sales data sheets located above. The adjustment grid that follows utilizes the sales price overall as the unit of comparison. The sales are analyzed and compared with the subject for similarities and differences. The elements considered to be inferior to the subject are adjusted upward while the superior qualities of the comparable sales are adjusted downward. In this analysis, adjustments have been based on physical and economically oriented differences in each competitive sale.  The amount of adjustment is determined by the extent to which the sale varies in relation to the qualities exhibited by the subject.  Adjustments for differences are made to the overall sale price of each comparable property to make the comparable equivalent to the subject as of the appraisal date. The adjustment process compensates for the difference between the comparable sale and subject and provides an indication of value for the subject.

**Analysis of Land Comparable.**

Every real estate transaction is unique and every parcel of land has its own distinct characteristics. As a result, the land sales must be adjusted for differences with the subject. The five primary differences are: 1) property rights conveyed, 2) financing, 3) conditions of sale or motivation of both the buyer or seller, 4) market conditions at the time of sale, and 5) physical characteristics of the sale as compared to the subject such as location, size, physical, zoning/use, access/frontage and utilities.  The appraiser confirmed these sales with the sales representatives.

**Real Property Rights Conveyed** - This adjustment compensates for differences in property rights conveyed, such as fee simple versus leasehold interests. We are estimating the market value of the fee simple interest in the properties. Since all of the comparable sales represent conveyance of the fee simple interest, no adjustments were required.

**Financing** - Financing recognizes the effects of any deferred purchase money financing by the seller at terms and conditions more favorable than through conventional third-party lenders. Financing did not appear to influence any of the comparables. No adjustments were applied.

**Conditions of Sale** - This adjustment reflects differences attributable to atypical buyer or seller motivation. No adjustments were required as the sales involved willing buyers and willing sellers.

14

**Market Conditions** - Market conditions shift over time due to inflation, deflation, changes in supply and demand, and the like.  This adjustment, often referred to as an adjustment for "time", takes these changes into consideration.  The comparable sales transpired from 2019 through 2020. Time adjustments were made for these sales on the basis of approximately 10% per year given the major market reaction to global, statewide, and local trends in 2020 and 2021.  This reflects the market according to local brokers and overall market trends.

**Sale No. 1:**   Adjusted 15% for time given its date of sale in October of 2019 a year and a half before the subject property date of value.  The property is located in the same subdivision as the subject property so no adjusted is required for location.  The sale is built in 2019 and adjusted downwards 10% to reflect the new construction and brand-new condition.  The sale is considered superior, and adjusted downwards 5%, for its third bathroom.  The sale is considered inferior for amenities given its corner location and proximity to traffic and considering it is about half the size of the subject property's lot acreage.

**Sale No. 2:**   Adjusted 5% for time given its date of sale in October of 2020 six months before the subject property date of value.  The property is located in an adjoining subdivision as the subject property so no adjusted is required for location.  The sale is built in 1982 and has been updated and no adjustment is necessary for condition of improvements.  The sale is considered superior in terms of its improvements, 3.5 bathrooms and 4 bedrooms, and size and a downwards 10% adjustment is made to account for those differences.  No adjustments necessary for amenities.

**Sale No. 3:**   Adjusted 5% for time given its date of sale in October of 2020 a half year before the subject property date of value.  The property is located in an adjoining subdivision as the subject property so no adjustment is required for location.  The sale is built about the same time as the subject property so no adjustment required for condition of the improvements.  The sale's improvements include similar square footage and bedroom and bathrooms.  Both properties are maintained well and a 5% adjustment is made for recent updates.  A 5% adjustment is appropriate for amenities given the subject's size and outbuildings.

A chart of the comparable sales and their adjustments is as follows:

| IMPROVED SALES COMPARABLE BEFORE SINKHOLE | | | | |
|---|---|---|---|---|
| - | Subject | 1 | 2 | 3 |
| Address | 205 Deep Water Way | 108 Marsh View Court | 418 Brewers Creek Lane | 205 Marsh View Court |
| Locality | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight |
| Sale Date | 2/1/2021 | 10/21/2019 | 10/29/2020 | 10/14/2020 |
| Sales Price | | $325,000 | $280,000 | $315,000 |
| Size (SF) | 2,049 | 1,900 | 2,752 | 2,056 |
| | | 171 | 102 | 153 |
| | | | | |
| Conditions | | Arm's Length | Arm's Length | Arm's Length |
| | | 0% | 0% | 0% |
| | | | | |

| Rights | | Fee Simple | Fee Simple | Fee Simple |
|---|---|---|---|---|
| | | 0% | 0% | 0% |
| | | | | |
| Financing | | Typical | Typical | Typical |
| | | 0% | 0% | 0% |
| | | | | |
| Timing | | Inferior | Inferior | Inferior |
| | | 15% | 5% | 5% |
| | | | | |
| Adjusted SP ($) | | $373,750 | $294,000 | $330,750 |
| | | | | |
| Location | Brewer's Creek | Similar | Similar | Similar |
| | | 0% | 0% | 0% |
| | | | | |
| Condition | Built in 1995 | Superior | Similar | Similar |
| | | -10% | 0% | 0% |
| | | | | |
| Improvements | 3 bed / 2 bath | Superior | Superior | Superior |
| | | -5% | -10% | -5% |
| | | | | |
| Amenities | 1.07 acre lot | Inferior | Similar | Inferior |
| | | 10% | 0% | 5% |
| | | | | |
| Overall | | -5% | -10% | 0% |
| | | | | |
| Indicated Price | | $355,063 | $264,600 | $330,750 |
| | | | | |
| Indicated Value of Subject | | $350,000 | | |

## RECONCILIATION AND FINAL OPINION OF VALUE

The Sales Comparison Approach to value the subject has been developed and resulted in an indication of $350,000 of market value for the entire Fee Simple Interest in the subject property.

After considering all of the comparable sales, the appraiser reconciled the overall value to $350,000.  In the Sales Comparison Approach, improved residential value was based on an analysis of the market, considering the location of the subject in relation to supply and demand forces.  After considering the pertinent valuation factors most pertinent to buyers and sellers in the Carrollton market, it is my opinion that the best indicator of value is the Sales Comparison Approach for the land and the market value of the subject as of February 1, 2021, was: THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000).

## ANALYSIS OF DRAINAGE EASEMENT AND FAILURE TO MAINTAIN

The appraiser reviewed documents including its docket in U.S. District Court and the survey work and engineering opinions of Hoggard-Eure & Associates, P.C.  The appraiser further reviewed the title work and subdivision plat of the easement recorded in this case, as well as other documents provided by the County.  The sinkhole serves to take tremendous utility in the affected property and also prevent the landowner from utilizing lands within the easement.  Due to the way the easement is now an open sinkhole, it serves as an open liability on the property.

The essence of the problem is that an easement exists on the subdivision plat giving rights to drain water from the subdivision through Mr. Brock's property.  No entity maintained the rip rap absorbing the impact of the stormwater and the County even refuses to maintain the easement once it became aware of the failure of the drainage improvements.  The appraiser attaches the engineering analysis from Jack Claud in the appendix and incorporates it by reference.  The sinkhole continues to grow as the water continues to wash away more soil.



The cost to permit and repair the property affected by the sinkhole is estimated at $139.262 by the County for a similar drainage improvement failure in the same subdivision.  Lewis Construction bid the cost of construction and repair of this drainage easement and bid the costs to be $71,866.95 using 21" pipe instead of 24" pipe and still approaches the County estimate of $79,761.60 for construction costs.  Both estimates are considered reliable and reflect that the cost to adjust the property to its condition before the County failed to maintain the drainage easement and its improvements are about $75,000 for bank stabilization.  The hard costs to adjust the property to its before condition hover around $75,000.

## ANALYSIS OF REMAINDER AFTER SINKHOLE

The remaining property will be the same, in regards to acreage, except the drainage easement with an underground concrete pipe is now an open trench variable width sinkhole with ongoing failure shown the length of the easement all the way to the public road.  Any knowledgeable buyer would discover this defect with a boundary survey if not on an inspection of the property.  The opinion letter from Nanette Criddle is incorporated by reference and opines that the Mr.

Brock must disclose the sinkhole to any prospective buyer. Substantial costs are required to stabilize the banks where the property drops off from ground-level to twenty feet (20') lower at the bottom of the sinkhole. This represents an active, ongoing, and increasing risk to the homeowner who risks an injury to someone who does not see the hole or someone who sees the hole is wants to play in it. It is reasonable and probable that children would play in an attractive nuisance like the hole and given the impacts to the soil there is unstable soils around the exposed concrete pipe which may cause injury. Adjustments required due to the detrimental condition of the adverse and open easement include fencing, signage, bank stabilization, permits, delineation, impact credits, engineering and survey, and other costs.

Market perceptions and issues related to adverse easements are as follows:

- Easement rights to others restricts use of the underlying property. Before the failure to maintain, a buyer could enjoy the area above the drainage improvements. Now the soils are not stable and there is an active, ongoing, and growing sinkhole. The area above the drainage improvements are a liability rather than an area that a buyer could enjoy or use.
- Increased holding costs due to the ongoing failure and refusals to maintain. Property sold fast during February 2021 causing this appraiser to determine thirty to forty-five days as reasonable marketing time. The adverse easement in this case will blunt the benefits of a hot real estate market.
- Disclosure of the existence of the sinkhole and existing unstable soils is necessary to market the property. Nanette Criddle explains the obligations of Mr. Brock and his agent representatives. The disclosure will cause lower negotiations or buyers to walk away.
- Knowledgeable buyers who purchase property encumbered by adverse easements expect to pay a discounted price. The cost to fix the ongoing failure in this case is more than $75,000.
- The market recognizes the easement is undefined and allows the County to leave the drainage in an open-trench. The buyer cannot use an easement area or the area required for the grade change. Detrimental conditions like permanent easements are negative factors on property.
- Uncertainty attaches to the property with the ongoing failure and refusal to maintain. The area subject to sinking continues to grow as shown by the Hoggard-Eure survey work.
- An easement creates a dominant interest to the easement holder. There is an unknown easement holder and an undefined partner with controlling interest in the easement.

Instead of selling the property at the top of the market in February 2021, Mr. Brock cannot sell his property except for a deep discount. A knowledgeable buyer would negotiate the costs of the repairs and more given the soft costs of planning, designing, and executing the adjustments necessary to restore stable soils to the property. Investors would remain interested in purchasing the property because of their special access to the markets required to fix the problems. Investors are savvy and negotiate steep discounts at the purchase of property in order to realize a profit upon sale. Typical homebuyers would lose interest in the property given its uncertainty, costs to adjust the existing conditions, and ongoing failure increasing the damage.

### VALUING THE RESIUDE AFTER SINKHOLE IMPACT

The appraiser used the same comparable sales and adjusted the amenity comparison 15% to reflect superior conditions of the sales without the detrimental conditions and with stable soils while the subject now requires more than $75,000 in adjustment costs to prevent further failure. Residential buyers considering residential investments of this quality maintain options and are deterred by adverse easements.

**IMPROVED SALES ADJUSTMENT GRID – AFTER SINKHOLE**

The appraiser used the comparable sales approach to determine the value of the property after the sinkhole caused by the failure to maintain the drainage easement and its improvements.  The appraiser utilized the same sales, found in the immediate local market, and adjusted the amenity comparison to reflect that the subject's lack of stable soils and costs to restore.

**IMPROVED SALES COMPARABLE AFTER SINKHOLE**

| | Subject | 1 | 2 | 3 |
|---|---|---|---|---|
| Address | 205 Deep Water Way | 108 Marsh View Court | 418 Brewers Creek Lane | 205 Marsh View Court |
| Locality | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight |
| Sale Date | 2/1/2021 | 10/21/2019 | 10/29/2020 | 10/14/2020 |
| Sales Price | | $325,000 | $280,000 | $315,000 |
| Size (SF) | 2,049 | 1,900 | 2,752 | 2,056 |
| | | 171 | 102 | 153 |
| | | | | |
| Conditions | | Arm's Length | Arm's Length | Arm's Length |
| | | 0% | 0% | 0% |
| | | | | |
| Rights | | Fee Simple | Fee Simple | Fee Simple |
| | | 0% | 0% | 0% |
| | | | | |
| Financing | | Typical | Typical | Typical |
| | | 0% | 0% | 0% |
| | | | | |
| Timing | | Inferior | Inferior | Inferior |
| | | 15% | 5% | 5% |
| | | | | |
| Adjusted SP ($) | | $373,750 | $294,000 | $330,750 |
| | | | | |
| Location | Brewer's Creek | Similar | Similar | Similar |
| | | 0% | 0% | 0% |
| | | | | |
| Condition | Built in 1995 | Superior | Similar | Similar |
| | | -10% | 0% | 0% |
| | | | | |

| | | | | |
|---|---|---|---|---|
| Improvements | 3 bed / 2 bath | Superior | Superior | Superior |
| | | -5% | -10% | -5% |
| | | | | |
| Amenities | 1.07 acre lot | Superior | Superior | Superior |
| | sinkhole | -5% | -15% | -10% |
| | | | | |
| Overall | | -20% | -25% | -15% |
| | | | | |
| Indicated Price | | $299,000 | $220,500 | $281,138 |

Indicated Value of Subject                    $275,000

## VALUATION OF REMAINDER AFTER

The valuation of the subject property after the sinkhole is appraised at TWO HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($275,000.00).  The appraiser checked this after value against two other comparable sales used for study purposes.  304 Lakeview Lane and 110 Deep Water Way, both in the subject subdivision, sold with adverse conditions.  An adjustment of their features as compared to the subject property is shown below:

| | Subject | 4 | 5 |
|---|---|---|---|
| Address | 205 Deep Water Way | 304 Lakeview Lane | 110 Deep Water Way |
| Sale Date | 2/1/2021 | 3/11/2021 | 12/12/2018 |
| Sales Price | | $149,000 | $210,000 |
| Size (SF) | 2,049 | 1,209 | 2,218 |
| | | Short Sale | Arm's Length |
| Conditions | | 25% | 0% |
| | | Fee Simple | Fee Simple |
| Rights | | 0% | 0% |
| | | Typical | Typical |
| Financing | | 0% | 0% |
| | | Similar | Inferior |
| Timing | | 0% | 20% |
| Adjusted SP ($) | | $186,250 | $252,000 |
| Location | Brewer's Creek | Similar | Similar |
| | | 0% | 0% |
| Condition | Built in 1995 | Inferior | Similar |
| | | 25% | 0% |
| Improvements | 3 bed / 2 bath | Inferior | Similar |
| | | 10% | 0% |
| Amenities | 1.07-acre lot | Similar | Superior |
| | sinkhole | 0% | -5% |
| Overall | | 35% | -5% |

20

| Indicated Price | $251,438 | $239,400 |
| --- | --- | --- |

The study sales reflect that investors buying properties with uncertain conditions, in this case a short sale in need of renovation and an improved sale sold "as is" due to known and disclosed defects, for indicated values of $239,400 to $251,438.  This is consistent with the conclusion of the appraiser that the subject property falls to $275,000 in value to the ongoing uncertainty and known detrimental conditions attached to the property caused by a widening sinkhole.

## SUMMARY

The value of the property before the adverse easement condition, $350,000, less the value of the property after the adverse easement condition, $275,000, reflects $75,000 owed in just compensation.

## AFFIDAVIT AND CERTIFICATION OF VALUE

I certify that, to the best of my knowledge and belief:

1.      The statements of fact contained in this report are true and correct.

2.      The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.      I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4.      I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.      My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.      My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.      My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute which include the *Uniform Standards of Professional Appraisal Practice*.

8.      The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives

9.      I have made personal visits to the property that is the subject of this certification.

10.     No one has provided significant real property appraisal assistance to the person signing this certification.

11.     As of the date of this report, I, Dennis W. Gruelle have completed the continuing education program of the Appraisal Institute and am certified by the States of North Carolina and Virginia as a Certified General Real Estate Appraiser.

12.     To the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and The Standards of Professional Appraisal Practice of the Appraisal Institute.

13.     I have not performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

14.     The opinion of value contained in this report for just compensation is $75,000.  The effective date of value is February 23, 2021.


_Dennis W. Gruelle_

Dennis W. Gruelle, MAI, SRA
Virginia Certified General
Real Estate Appraiser #4001001489

10-7-2021
Date

**ADDENDA**

## QUALIFICATIONS OF
## Dennis W. Gruelle, MAI, SRA

**PROFESSIONAL DESIGNATIONS/CERTIFICATIONS**

MAI and SRA - Appraisal Institute
Commonwealth of Virginia Certified General Real Estate Appraiser No. 4001 001489
State of North Carolina State Certified General Real Estate Appraiser No. A3562

**ACCREDITED APPRAISAL COURSES**

**Appraisal Courses Attended and Completed**
Virginia Real Estate Appraiser Law Course
Course SE700 The Appraiser as an Expert Witness
Course 710 Condemnation Appraising
Condemnation Valuation
Standards of Professional Practice
Course 101 Principles and Theory
Course 102 Applied Residential Property Valuation
Course 202 Applied Income Property Valuation
Course 510 Advanced Income Capitalization

**Appraisal Examinations Challenged and Passed**
Real Estate Appraisal Principles (1A-1)
Basic Valuation Procedures (1A-2)
Case Studies in Real Estate Valuation (2-1)
Course 201 - Substitute Credit (AIREA CAP A & B)

**Appraisal Courses with no Exam**
Introduction to Cash Flow and Risk Analysis (310)
Marketability and Market Analysis (311)
Real Estate Investment Analysis (312)
Professional Practice
Advanced Capitalization (510)

**EDUCATION**

Graduate of Illinois State University, B.S. 1974

**PROFESSIONAL EXPERIENCE**

Senior Appraiser associated with the firm of Appraisal Consultation Group.  Appraisal experience includes the analysis and preparation of appraisal reports, evaluating a variety of interests in numerous property types including single and multi-family, office, retail, rural, special purpose properties and right-of-way.

Appraisal work product has been accepted and utilized for mortgage lending, estate tax planning and settlement, property exchange, corporate management decisions and partial taking/just compensation analysis by acquiring agencies and property owners.  I have qualified as an expert witness in State courts of Texas, Virginia and North Carolina as well as Federal Courts.

Professional Activities: Certified Instructor with the International Right of Way Association, Inc.

Dennis W. Gruelle's fee for this appraisal will be $2,500.00 and his hourly rate is $300/hour for deposition, trial testimony and deposition and trial preparation and travel.

# EXHIBIT F

*APPRAISAL CONSULTATION GROUP*

5511 Princess Anne Road
Virginia Beach, Virginia 23462
(757) 497-1229    FAX (757) 497-1438

October 7, 2021

Brian & Susan Fernaays
207 Deep Water Way
Carrollton, VA 23314

Re:     Sinkhole and failure to maintain drainage easement

Dear Mr. & Mrs. Fernaays:

Please accept the enclosed report as an updated appraisal report of the above identified property before and after the sinkhole caused by Isle of Wight County's failure to maintain a drainage easement.  New information may cause certain changes to my analyses.  My opinions of value may change as well depending on rulings in your case or the discovery of more information.

To the best of my knowledge this appraisal has been prepared in compliance with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) as adopted by the Appraisal Foundation, and the Code of Professional Ethics of the Appraisal Institute. This report is to be used to assist you in making decisions in evaluating the impact of the failure of the County to maintain the existing drainage easement and its improvements.

Brian & Susan Fernaays
October 7, 2021
Page 2

This report reflects the property's size as 1.77 acres consistent with public records. Based on the data and analysis in this report, it is my opinion that the difference in market values before and after the impact, subject to the assumptions and Statement of Limiting Conditions was $190,000 as of the date of the filing of your lawsuit, February 23, 2021.

Thank you for this opportunity to be of service to you.

Respectfully submitted,

Dennis W. Gruelle, MAI, SRA
Virginia Certified General
Real Estate Appraiser #4001001489

**APPRAISAL OF REAL PROPERTY**

207 Deep Water Way
Carrollton, VA 23314

PREPARED FOR

Brian & Susan Fernaays

PREPARED BY

Dennis W. Gruelle MAI, SRA
Appraisal Consultation Group

**DATE OF OPINION OF VALUE**

February 23, 2021

**Date of Report**

October 7, 2021

## EXECUTIVE SUMMARY

**Location:**            207 Deep Water Way, Carrollton, VA 23314

**Intended User:**       Brian & Susan Fernaays

**Intended Use:**        For the purpose of assisting the client in evaluating the impact
                         the County's refusal to maintain an existing drainage easement

**Property Rights**
  **Appraised:**       Fee Simple Rights

**Zoning:**              Single-family residential

**Highest & Best Use - Before**

**As If Vacant:**        Development for residential uses with deep water access

**As Improved:**         Single-family residential use with deep water access

**Highest & Best Use - After**

 **As If Vacant:**       Inferior residential development without deep water access

 **As Improved:**        Inferior single-family residential use without deep water access

**Date of Valuation:**    February 23, 2021

**Date of Report:**      October 7, 2021

**Exposure Time:**       30-45 days

**Final Opinion of Value Before:**        $575,000
**Value After:**                          $385,000
**Difference:**                           $190,000

1

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to provide an opinion of the fair market value of the fee simple interest in the subject property immediately prior to the litigation (Before Value) without regard to the sinkhole, and an opinion of the fair market value after considering the sinkhole as of the same date. I have assumed that the County and/or VDOT will not make repairs and prefer to leave the drainage easement open and expanding consistent with this existing state which continues to deteriorate over the last two to three years.

## DEFINITION OF VALUES USED IN THIS REPORT

**Fair market value** is "what a willing buyer would pay in cash to a willing seller at the time of taking."

Source:  Kirby Forest Industries, Inc. v. United States 468 US 1 (1984)

**Legal Definition of Market Value** as used is this report is defined by the Commonwealth of Virginia as follows:

> "The price which one, under no compulsion, is willing to take for a property which he has for sale, and for which another, under no compulsion, being desirous and able to buy, is willing to pay for the article."

Source: Talbot vs. Norfolk, 158 Va. 387, 391. (1932).

These two definitions are considered to be synonymous for the purposes of this report.

**Fee Simple** is defined by The Dictionary of Real Estate Appraisal, Fifth Edition as:

> "An absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

**Easement Rights** as used herein is defined as: "An interest in real property that transfers use, but not ownership, of a portion of an owner's property. Access or right-of-way easements may be acquired by private parties or public utilities. Governments accept conservation, open space and preservation easements on private property." (*The Appraisal of Real Estate,* 14th Edition, Page 117, published by the Appraisal Institute.)

## DESCRIPTION FOR IDENTIFICATION

The subject property contains 1.77 acres of land fronting Deep Water Way in Carrollton, Virginia. The Tax identification number is 34H-01-031.

2

## OWNERSHIP & PROPERTY HISTORY

The property is owned by Brian & Susan Fernaays.  The property has not been bought or sold in the last fifteen years.

## COMPLIANCE

This appraisal report is intended to conform with the minimum standards set forth in Standards 1 and 2 of the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Standards Board of the Appraisal Foundation.

## EXPOSURE TIME ANALYSIS

As required by the Uniform Standards of Professional Appraisal Practice, when estimating market value, an appraisal should be specific as to the estimate of exposure time linked to the value estimate.

The difference between exposure time and marketing time is the time frame of analysis. Exposure time considers that period preceding the effective date of appraisal, whereas marketing time is that period immediately after the effective date of appraisal.

In the past, real estate markets have been observed to be cyclical.  The demand for real estate ebbs and flows with national, regional and local economies and is constantly in competition with alternative investment vehicles provided through the financial markets. As demonstrated by the several sales summarized in this report there is demand for this property type, if priced competitively. In consideration of the foregoing, it is estimated that an exposure time of thirty (30) to forty-five (45) days is reasonable for the subject property given the market activity as of the date of take.

## SCOPE OF THE APPRAISAL

The scope of this appraisal assignment includes the necessary research and analysis to prepare this report in accordance with its intended use and the *Uniform Standards of Professional Appraisal Practice (USPAP)* of the Appraisal Institute. With regard to the subject property, this involved the following steps:

1)      The subject property was inspected by Dennis Gruelle on multiple occasions in 2021.

2)      Regional and neighborhood data were based on information available regarding the market and a physical inspection of the area.

3)      The subject property data was based on a physical inspection and information provided by the owners as well as public records.

4)    In estimating the highest and best use of the property, an analysis was made of the market, data compiled through research in the marketplace, comparable sales activities, conversations with knowledgeable builders and brokers, review of county records and conversations with others such as those people in the construction industry consulted.

5)    In developing the approaches to value, the market data used was collected from our office files, other appraisers, brokers, property owners, and other persons knowledgeable about the subject market and the subject property's market segment. The sales comparison approach was developed as this approach is considered most applicable to this appraisal problem.

6)    Public records and broker discussions were relied upon regarding comparable sales physical characteristics.

7)    After assembling and analyzing the data defined in this scope of the appraisal, a final opinion of market value before was made. I relied on research and broker interviews to develop a final opinion of value for the subject property. I relied on market data, study sales, my experience, interviews with brokers, developers, appraisers, appraisal reports and market participants to determine the impact the taking would have on the subject property.  I also considered text books, course materials and teaching materials published by nationally recognized appraisal organizations, including the International Right of Way Association and The Appraisal Institute including Donnie Sherwood's "The Valuation of Easements" article as published in the November/December 2014 issue of *Right of Way Magazine*;. Other documents considered include: deeds and related land records; surveys, plats, plans, pictures, images or other documents depicting or showing comparable properties; surveys, plats, plans, pictures, images or other documents depicting or showing the location and growth of the sinkhole on the private properties; documents including correspondence and communications; documents describing the construction activities and construction timeline in connection with the construction bank stabilization and dredging required as a result of the sinkhole; articles and publications listed in the addenda of this report. The opinions and conclusions developed in this report are considered reasonable and market based.

8)    Hoggard-Eure's survey exhibit showing the sinkhole growth dated September 8, 2021, were reviewed to determine the extent of the sinkhole effects and are incorporated by reference.  The appraiser also reviewed the Court's docket including the complaint filed.

9)    This is an appraisal report which is intended to comply with the reporting requirements set forth under the Standards Rule 2-2 (a) of the *Uniform Standards of Professional Appraisal Practice*.  The depth of discussion contained in this report is specific to the needs of the client and intended use as stated herein.

**STATEMENT OF LIMITING CONDITIONS**

4

- I assume no responsibility for legal matters affecting the property or the title thereto; nor do I render any opinion as to the title, which is assumed to be good and marketable.

- The property is appraised as though free and clear, under responsible ownership, and competent management, unless otherwise indicated.

- Any photographs or sketches included are to aid the reader in visualizing the property.

- The information on which this appraisal is based has been obtained from sources normally used by Appraisal Consultation Group and is considered to be reliable, but is in no sense guaranteed.

- I am not required to give testimony or appear in court because of having made this appraisal with reference to the property in question, unless arrangements have been previously made. The fee charged for this appraisal does not include payment for court testimony or for further consultation.

- No inspection for termite damage was made and no responsibility has been assumed in connection with this matter.

- No tests have been made by the appraiser to determine load bearing qualities, percolation, subsoil conditions, or drainage conditions and no consideration has been given to the requirements regarding flood insurance for loan purposes.

- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. This report assumes that the improvements will be in compliance with the requirements of ADA.

- For the purposes of evaluating this property, the value conclusion in this report expressly assumes that there are no current or potential major structural concerns with the subject property. Any expenses incurred with remedial action would impact the opinion of value.

- The appraiser assumes there are no hidden or unapparent conditions of the property, subsoil or otherwise, which would render it more or less valuable other than those listed in the extraordinary assumptions.

- Economic projections in this report assume a level economy and the value stated is in United States currency as of the effective date of this appraisal.

- I have relied on information provided by others. This information is assumed to be true and correct; however, we reserve the right to alter the value conclusion if the information proves to have inaccuracies, is incomplete, or if pertinent information has been withheld.

- Disclosure of the contents of this appraisal is governed by the Bylaws and Regulations of the professional organizations with which the appraisers are affiliated.

- Acceptance of and/or use of this report constitutes agreement with these terms and conditions.

- The whole property size is based upon provided information and public records. Should this information not be correct I reserve the right to update this report.

## EXTRAORDINARY ASSUMPTIONS AND DISCLOSURES

An extraordinary assumption is defined by USPAP to be "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions". Extraordinary assumptions presume as fact otherwise uncertain information. In other words, this type of assumption involves uncertainty about an underlying premise. An example is a survey that displays a lot size. If the lot size is later found to be much smaller, then the value conclusion may be affected.

USPAP Standard Rule 1-2(f) requires the identification of all extraordinary assumptions that are necessary for credible assignment results. This appraisal employs the following extraordinary assumptions.

- Features of the subject site such as size, dimensions, etc. were obtained from the public records, the client and their legal representatives. Information provided is assumed to be reasonably correct. Changes would have an impact on value.

- Observation of the subject property included walking over portions of the property. It is assumed that the subject has no hidden defects. No probes or attempts to remove materials to discover unapparent defects were made by the appraiser.

- I have assumed that the County and/or VDOT own the drainage easement at issue in this matter.  If a private party owns the drainage easement the valuation information in this report is not subject to change necessarily although the report would require certain corrections.  I reviewed the title report of Patricia Raper.

- I have assumed that the Court will determine the date of take to be the date that the clients filed suit in court.  It is my understanding that the client tried to get the County and VDOT to take responsibility and both entities refused.  The date of the court filing represents the date of certainty that the governmental entities did not intend to fix, repair, or otherwise maintain the drainage easement.  If the Court or jury determines a different date of take that would impact valuation.

The above extraordinary assumptions as well as other assumptions anywhere herein are integral premises upon which the conclusions in this document are based. If any of these assumptions are later found to be untrue or inaccurate, then this report's assignment results may be affected.

## RESTRICTIONS UPON DISCLOSURE AND USE

Neither all nor any part of the contents of this report (especially any conclusions as to value, identity of the appraisers or firm with which they are connected or any reference to the Appraisal Institute or the MAI designation) shall be disseminated to the public through the advertising media or any other public means of communication without the prior written consent and approval of Appraisal Consultation Group.

## CARROLLTON AREA DATA

The subject property is located in Carrollton area of Isle of Wight County.  This area of the Tidewater region is popular for residential use as it is rural, proximate to rural recreational uses like boating, fishing, and hunting.  The area offers water access, privacy, and natural scenery. The area accesses larger markets in Newport News by the Route 17 bridge and in Suffolk and Norfolk via Route 164.  The area is popular for residential uses given its reasonable commute.

## MARKET AREA ANALYSIS

A market area is defined by the *Dictionary of Real Estate Appraisal*, Fifth Edition as "The area associated with a subject property that contains its direct competitors."  A neighborhood is defined by the Thirteenth Edition of *The Appraisal of Real Estate* as a grouping of complementary land uses, which exhibits a greater degree of uniformity than a larger area. Neighborhoods are defined by environmental, social, governmental and economic forces, as well as physical characteristics, and are perceived to be relatively uniform.  A neighborhood may also reflect shared features such as similar building types and styles, population characteristics, economic profiles of occupants and zoning regulations that affect land use, rent and occupancy levels, the credit strength of occupants and ages of the buildings.  The purpose in defining and describing a neighborhood is to determine factors, which influence property values.  Probable trends are also considered.  Isle of Wight County is rural with areas devoted to residential uses as well as a significant amount of cropland and woodland areas.  The northern portion of the County experienced a lot of growth, and continues to grow, given its rural appeal to residential uses and simple commute to major markets using Route 17 and Route 164.  The subject property is located off of Route 17 within minutes of the James River Bridge and Newport News.  The submarket reveals consistent market activity of improved sales for residential use.

## SITE DESCRIPTION

The following information is based upon public records for the property as well as physical inspections and information obtained from the owner. The subject is located at Deep Water Way.

**Location:**              207 Deep Water Way in Carrollton, VA.

**Size and Shape:**        The parcel is irregular in shape and 1.77 AC.

**Frontage:**              The property has frontage on Deep Water Way.

7

| | |
|---|---|
| **Topography:** | The property includes cleared land and rolling terrain towards the ravine and Brewer's Creek. |
| **Utilities:** | Electric, telephone, and water. |
| **Zoning:** | SR – single-family residential. |
| **Land Use:** | Single-family residential. |
| **Access and Visibility:** | Access and visibility from Deep Water Way. |
| **Summary:** | The subject site is well situated for residential uses. |

**HIGHEST AND BEST USE OF THE PROPERTY BEFORE**

Highest and best use of land or a site as though vacant is defined in *The Dictionary of Real Estate Appraisal*, (5th Edition) as:

> probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.

Where a site has existing improvements, the highest and best use for the land as if vacant may be different from the existing use. For this reason, land is valued on the basis of its highest and best use as though vacant and available for development to its most economic use. The existing use will continue, however, until the land value as if vacant exceeds the total value of the property in its existing use.  The four key tests to the highest and best use of any property are 1) physically possible, 2) legally permissible, 3) financially feasible, and 4) maximally productive.

<u>**Highest and Best Use As If Vacant:**</u>

**Physically possible -** In order for any use to be considered, it must be physically possible to develop that use on the site. The subject site contains 1.77 acres and is bordered by a creek and a ravine which serve as the few limitations on physical use.

**Legally Permissible:** The subject is currently SR for single-family residential uses.  A use other than residential use is not considered reasonable and probable.

8

**Financially Feasible:**  The subject property is located an area that is residential.  The property fronts Brewer's Creek which creates value as a residential recreational amenity.

**Maximally Productive -** Of the uses which are physically possible, legally permissible and financially feasible, that use which provides the greatest return is considered to be the maximally productive use and the highest and best use. I have concluded that the highest and best use of the subject as vacant is for high-end residential development with deep water access.

**<u>Highest and Best Use - As Improved:</u>**  The subject property is improved with a 2,406 SF house built in 1999.  I inspected the building and observed all of the site improvements and work, including landscaping, driveway, boat lift, and dock.  The subject property is marketable for single-family residential use and there is an immediate market in the Carrollton submarket for this use.  To consider its highest and best use, the appraiser determined there were local sales for use in comparison.  The appraiser inspected the improvements which indicate they are market ready.

**APPROACHES TO VALUE OF PROPERTY BEFORE PROJECT**

The best use of the property is for sale for residential use.  Property is valued by application of the three standard approaches to value: Cost Approach, Income Approach and Sales Comparison Approach. All three approaches have been considered; however, the Sales Comparison Approach has been developed in arriving at a value estimate for the subject property.

The Sales Comparison or Market Data Approach is a systematic process of comparing properties which have sold to the property being appraised. This approach involves going directly into the marketplace and accumulating information on sales of properties judged to be comparable to the property under analysis. The data is reduced to a common denominator, or in appraisal terminology, unit of comparison which, when applied to the subject, gives an indication of market value. This approach has been utilized for the whole property valuation.

The Cost Approach is used to value improvements. The principle of substitution is basic to the Cost Approach. The principle affirms that no prudent investor or buyer would pay more for a property than the amount for which the site can be acquired and for which improvements that have equal desirability and utility can be constructed without undue delay. This approach was not utilized given the amount of sales of similar properties for similar uses nearby.

In the Income Approach, net income is translated into a value indication through capitalization. The net income that the property is capable of producing is divided by the appropriate capitalization rate applicable to market conditions.  This approach to value is created by the expectation of benefits to be derived in the future, namely, net income. This approach has not been developed to appraise the whole property because this is not an active rental market.

This assignment involves an easement for drainage not maintained by any public or private entity. As such, it is necessary to quantify and allocate the value of the property after to

9

determine if the public use causes damage to the private property value.  The Sales Comparison Approach is the best method to address the current appraisal problem and was utilized to study the market, appraise the value of the whole property before impact from the sinkhole, and value the whole property after impacts from the failure to maintain which developed into a sinkhole.

## IMPROVED SALES COMPARISON

The sales comparison is the most common technique for valuing improved residential sales and is the preferred method when comparable sales are available. To apply this method, sales of similar properties are analyzed, compared, and adjusted to produce a value indication for the land being appraised. In the comparison process, the similarity or dissimilarity of the sales is considered.  There have been several sales in the market and this report includes sales which offer the most comparability in location, date of sale, and features.  Once sales are collected and reduced to a unit of comparison, adjustments are made for differences between market sales and the subject property. After analysis of the sales, the appraisers place the most credence on the most similar sales and from the reconciliation of these sales, a final value estimate is determined.  The following sales used to estimate the value for the subject are reported on the following pages:

| Sale #: | Date | Sales Price | Location | Size | $/SF |
|---|---|---|---|---|---|
| 1 | 4/29/19 | $485,000 | 23242 Pearl Court | 2,433 | $199 |
| 2 | 5/7/19 | $535,000 | 216 Deep Water Way | 2,105 | $254 |
| 3 | 9/30/19 | $700,000 | 215 Deep Water Way | 5,770 | $121 |
| 4 | 9/1/20 | $445,000 | 208 Marsh View Court | 3,318 | $134 |
| Subject | 2/23/21 | | 207 Deep Water Way | | |

10

**Improved Comparable 1**

| | |
|---|---|
| **Location:** | 23242 Pearl Court |
| **Parcel #:** | 43A-12-010 |
| **Grantor:** | Valerie R. Fox |
| **Grantee:** | Dawn E. & Troy A. Lane |
| **Date:** | 4/29/2019 |
| **Zoning:** | SR |
| **Utilities:** | Electrical and telephone, well, and septic. |
| **Improved Size:** | 2,433 SF |
| **Consideration:** | $485,000 |

**Improved Comparable 2**

| | |
|---|---|
| **Location:** | 216 Deep Water Way |
| **Parcel #:** | 34H-01-026 |
| **Grantor:** | James B. & Anne G. Bentley |
| **Grantee:** | Dwight & Gina Baker |
| **Date:** | 5/7/2019 |
| **Zoning:** | SR |
| **Utilities:** | Electric and telephone and water and septic |
| **Improved Size:** | 2,105 SF |
| **Consideration:** | $535,000 |

**Improved Comparable 3**

| | |
|---|---|
| **Location:** | 215 Deep Water Way |
| **Parcel #:** | 34H-01-027 |
| **Grantor:** | John R. & Dorothy D. Ashburn |
| **Grantee:** | John V. & Shannon R. Ducote |
| **Date:** | 9/30/2019 |
| **Zoning:** | SR |
| **Utilities:** | Electric, telephone, water, and septic. |
| **Improved Size:** | 4,907 SF |
| **Consideration:** | $700,000 |

**Improved Comparable 4**

| | |
|---|---|
| **Location:** | 208 Marsh View Court |
| **Parcel #:** | 34H-01-005 |
| **Grantor:** | Angus I. Hines, III |
| **Grantee:** | Jeffrey Kyle & Kelly Wrenn Daniels |
| **Date:** | 9/1/2020 |
| **Zoning:** | SR |
| **Utilities:** | Electric, telephone, water, and septic. |
| **Improved Size:** | 2,522 SF |
| **Consideration:** | $445,000 |

**SALES COMPARISON APPROACH – BEFORE LAND**

**SUMMARY OF SALES DATA**

| Sale #: | Date | Sales Price | Location | Size | $/SF |
|---|---|---|---|---|---|
| 1 | 4/29/19 | $485,000 | 23242 Pearl Court | 2,433 | $199 |
| 2 | 5/7/19 | $535,000 | 216 Deep Water Way | 2,105 | $254 |
| 3 | 9/30/19 | $700,000 | 215 Deep Water Way | 5,770 | $121 |
| 4 | 9/1/20 | $445,000 | 208 Marsh View Court | 3,318 | $134 |
| Subject | 2/23/21 | | 207 Deep Water Way | | |

The above grid summarizes the data presented in the improved sales data sheets located above. The adjustment grid that follows utilizes the sales price overall as the unit of comparison. The sales are analyzed and compared with the subject for similarities and differences. The elements considered to be inferior to the subject are adjusted upward while the superior qualities of the comparable sales are adjusted downward. In this analysis, adjustments have been based on physical and economically oriented differences in each competitive sale.  The amount of adjustment is determined by the extent to which the sale varies in relation to the qualities exhibited by the subject.  Adjustments for differences are made to the overall sale price of each comparable property to make the comparables equivalent to the subject as of the appraisal date. The adjustment process compensates for the difference between the comparable sale and subject and provides an indication of value for the subject.

**Analysis of Land Comparable.**

Every real estate transaction is unique and every parcel of land has its own distinct characteristics. As a result, the land sales must be adjusted for differences with the subject. The five primary differences are: 1) property rights conveyed, 2) financing, 3) conditions of sale or motivation of both the buyer or seller, 4) market conditions at the time of sale, and 5) physical characteristics of the sale as compared to the subject such as location, size, physical, zoning/use, access/frontage and utilities.  The appraiser confirmed these sales with the sales representatives.

**Real Property Rights Conveyed** - This adjustment compensates for differences in property rights conveyed, such as fee simple versus leasehold interests. We are estimating the market value of the fee simple interest in the properties. Since all of the comparables represent conveyance of the fee simple interest, no adjustments were required.

**Financing** - Financing recognizes the effects of any deferred purchase money financing by the seller at terms and conditions more favorable than through conventional third-party lenders. Financing did not appear to influence any of the comparables. No adjustments were applied.

**Conditions of Sale** - This adjustment reflects differences attributable to atypical buyer or seller motivation. No adjustments were required as the sales involved willing buyers and willing sellers.

15

**Market Conditions** - Market conditions shift over time due to inflation, deflation, changes in supply and demand, and the like. This adjustment, often referred to as an adjustment for "time", takes these changes into consideration. The comparable sales transpired from 2019 through 2021. Time adjustments were made for these sales on the basis of approximately 10% per year given the major market reaction to global, statewide, and local trends in 2020 and 2021. This reflects the market according to local brokers and overall market trends.

**Sale No. 1:**   Adjusted 20% for time given its date of sale in April of 2019 almost two years before the subject property date of value. The property is located in the same subdivision as the subject property so no adjusted is required for location. The sale is built about the same time as the subject property and reflects a similar bedroom and bathroom count as the subject property. Both properties are maintained well and no adjustments were necessary for the condition, type, or size of improvements. Both offer similar deep-water access to Brewer's Creek from dock improvements although the subject property includes a covered boat lift which the sale does not. Overall, no adjustments necessary for amenities.

**Sale No. 2:**   Adjusted 20% for time given its date of sale in May of 2019 almost two years before the subject property date of value. The property is located in the same subdivision as the subject property so no adjusted is required for location. The sale is built about the same time as the subject property and reflects a similar bedroom and bathroom count as the subject property. Both properties are maintained well and no adjustments were necessary for the condition, type, or size of improvements. Both offer similar deep-water access to Brewer's Creek from dock improvements and both include a covered boat lift of similar construction and size. Therefore, there were no adjustments necessary for amenities.

**Sale No. 3:**   Adjusted 15% for time given its date of sale in September of 2019 about a year and a half before the subject property date of value. The property is located in the same subdivision as the subject property so no adjusted is required for location. The sale is built about the same time as the subject property so no adjustment required for condition of the improvements. The sale's improvements include more bedrooms and bathrooms and more than double the finished square feet offered by the subject property. The sale is a much bigger house. Both properties are maintained well and an overall 25% downward adjustment required for the improvements. Both offer similar deep-water access to Brewer's Creek from dock improvements and both include a covered boat lift of similar construction and size. Therefore, there were no adjustments necessary for amenities. Overall, a 25% negative adjustment.

**Sale No. 4:**   Adjusted 5% for time given its date of sale in September of 2020 about six months years before the subject property date of value. The property is located in the same subdivision as the subject property so no adjusted is required for location. The sale is built about the same time as the subject property so no adjusted is required for condition of improvements. The sale reflects five bedrooms as compared to the subject's three and 3,318 of finished square feet as compared to the subject's 2,406. A downwards adjustment of 5% was appropriate for the larger size of the sale. An upwards adjustment is appropriate for amenities given the subject's covered boat lift and better creek access.

A chart of the comparable sales and their adjustments is as follows:

16

| IMPROVED SALES COMPARABLE TO FERNAAYS PROPERTY BEFORE SINKHOLE | | | | | |
|---|---|---|---|---|---|
| | Subject | 1 | 2 | 3 | 4 |
| Address | 207 Deep Water Way | 23242 Pearl Court | 216 Deep Water Way | 215 Deep Water Way | 208 Marsh View Court |
| Locality | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight |
| Sale Date | 2/23/2021 | 4/29/2019 | 5/7/2019 | 9/30/2019 | 9/1/2020 |
| Sales Price | | $485,000 | $535,000 | $700,000 | $445,000 |
| Size (SF) | 2,406 | 2,433 | 2,105 | 5,770 | 3,318 |
| Conditions | | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| | | 0% | 0% | 0% | 0% |
| Rights | | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| | | 0% | 0% | 0% | 0% |
| Financing | | Typical | Typical | Typical | Typical |
| | | 0% | 0% | 0% | 0% |
| Timing | | Inferior | Inferior | Inferior | Inferior |
| | | 20% | 20% | 15% | 5% |
| | | | | | |
| Adjusted Sales Price ($) | | $582,000 | $642,000 | $805,000 | $467,250 |
| | | | | | |
| Location | Brewer's Creek | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Condition | Built in 1999 | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Improvements | 3 bed / 3 bath | Similar | Similar | Superior | Superior |
| | | 0% | 0% | -25% | -5% |
| | | | | | |
| Amenities | 1.77-acre lot | Similar | Similar | Similar | Inferior |
| | deep water access | 0% | 0% | 0% | 5% |
| | boat lift and dock | | | | |
| Overall | | 0% | 0% | -25% | 0% |
| | | | | | |
| Indicated Price | | $582,000 | $642,000 | $603,750 | $467,250 |
| | | | | | |
| Indicated Value of Subject | $575,000 | | | | |

## RECONCILIATION AND FINAL OPINION OF VALUE

The Sales Comparison Approach to value the subject has been developed and resulted in an indication of $575,000 of market value for the entire Fee Simple Interest in the subject property.

After considering all of the comparable sales, the appraiser reconciled the overall value to $575,000.  In the Sales Comparison Approach, improved residential value was based on an analysis of the market, considering the location of the subject in relation to supply and demand forces.  After considering the pertinent valuation factors most pertinent to buyers and sellers in the Carrollton market, it is my opinion that the best indicator of value is the Sales Comparison Approach for the land and the market value of the subject as of February 23, 2021, was: FIVE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($575,000).

## ANALYSIS OF DRAINAGE EASEMENT AND FAILURE TO MAINTAIN

The appraiser reviewed documents including its docket in U.S. District Court and the survey work and engineering opinions of Hoggard-Eure & Associates, P.C.  The appraiser further reviewed the title work and subdivision plat of the easement recorded in this case, as well as other documents provided by the County.  The appraiser consulted with David Baisley of Stokes Environmental who inspected the sinkhole and advise the appraiser of the permitting, surveying, and design requirements to perform bank stabilization and dredging to remove the sediment displaced into the Fernaays' boat slip.  The sinkhole serves to take tremendous utility in the affected property and also prevent the landowner from utilizing lands within the easement.  Due to the way the easement is now an open sinkhole, it serves as an open liability on the property.

The essence of the problem is that an easement exists on the subdivision plat giving rights to drain water from the subdivision through the Fernaays' property.  No entity maintained the rip rap absorbing the impact of the stormwater and the County even refuses to maintain the easement once it became aware of the failure of the drainage improvements.  The appraiser attaches the engineering analysis from Jack Claud in the appendix and incorporates it by reference.  The sinkhole continues to grow as the water continues to wash away more soil.



The cost to permit and repair the property affected by the sinkhole is estimated at $139,262 by the County for a similar drainage improvement failure in the same subdivision. Lewis Construction bid the cost of construction and repair of this drainage easement and bid the costs to be $71,866.95 using 21" pipe instead of 24" pipe and still approaches the County estimate of $79,761.60 for construction costs. Both estimates are considered reliable and reflect that the cost to adjust the property to its condition before the County failed to maintain the drainage easement and its improvements are about $75,000 for bank stabilization. David Baisley of Stokes Environmental confirmed that the Fernaays would need to delineate, design, and permit the bank stabilization and dredging work required to repair the ongoing failure and restore the Fernaays' boat slip to its condition before the drainage improvements failed. The appraiser performed depth soundings while inspecting the subject property and determined that the boat slip had less than three and a half feet of depth at low tide. No depth sounding reflected more than three and a half feet of depth. Nathan Iseman of Iseman Marine Construction confirmed that four feet is the minimum required for motor boat and recreation boating access. Mr. Iseman likewise confirmed that the cost to dredge the Fernaays' riparian zone, not including design and permitting, is at least $30,000. The hard costs to adjust the property to its before condition hover around $150,000.

## ANALYSIS OF REMAINDER AFTER SINKHOLE

The remaining property will be the same, 1.77 acres, except the drainage easement with an underground concrete pipe is now an open trench variable width sinkhole with ongoing failure shown the length of the easement all the way to the public road. Any knowledgeable buyer would discover this defect with a boundary survey if not on an inspection of the property. The opinion letter from Nanette Criddle is incorporated by reference and opines that the Fernaays must disclose the damage to their deep-water access to any prospective buyer also. The loss of deep-water access changes the entire nature of the residential property. Substantial costs are required to stabilize the banks where the property drops off from ground-level to twenty feet (20') lower at the bottom of the sinkhole. This represents an active, ongoing, and increasing risk to the homeowner who risks an injury to someone who does not see the hole or someone who sees the hole is wants to play in it. It is reasonable and probable that children would play in an attractive nuisance like the hole and given the impacts to the soil there is unstable soils around the exposed concrete pipe which may cause injury. Adjustments required due to the detrimental condition of the adverse and open easement include fencing, signage, bank stabilization, permits, delineation, impact credits, engineering and survey, dredging, and other associated costs.

Market perceptions and issues related to adverse easements are as follows:

- Easement rights to others restricts use of the underlying property. Before the failure to maintain, a buyer could enjoy the area above the drainage improvements. Now the soils are not stable and there is an active, ongoing, and growing sinkhole. The area above the drainage improvements are a liability rather than an area that a buyer could enjoy or use.
- Increased holding costs due to the ongoing failure and refusals to maintain. Property sold fast during February 2021 causing this appraiser to determine thirty to forty-five days as

reasonable marketing time.  The adverse easement in this case will blunt the benefits of a hot real estate market.

- Disclosure of the existence of the sinkhole and sediment impacts in the boat slip is necessary to market the property.  Nanette Criddle explains the obligations of the Fernaays and their agent representatives.  The disclosure will cause lower negotiations or buyers to walk away.
- Knowledgeable buyers who purchase property encumbered by adverse easements expect to pay a discounted price.  The cost to fix the ongoing failure in this case is more than $150,000.
- The market recognizes the easement is undefined and allows the County to leave the drainage in an open-trench.  The buyer cannot use an easement area or the area required for the grade change.  Detrimental conditions like permanent easements are negative factors on property.
- Uncertainty attaches to the property with the ongoing failure and refusal to maintain.  The area subject to sinking continues to grow as shown by the Hoggard-Eure survey work.
- An easement creates a dominant interest to the easement holder.  There is an unknown easement holder and an undefined partner with controlling interest in the easement.

Instead of selling the property at the top of the market in February 2021, the Fernaays cannot sell their property except for a deep discount.  A knowledgeable buyer would negotiate the costs of the repairs and more given the soft costs of planning, designing, and executing the adjustments necessary to restore deep-water access and stable soils to the property.  Investors would remain interested in purchasing the property because of their special access to the markets required to fix the problems.  Investors are savvy and negotiate steep discounts at the purchase of property in order to realize a profit upon sale.  Typical homebuyers would lose interest in the property given its uncertainty, costs to adjust the existing conditions, and ongoing failure increasing the damage.

### VALUING THE RESIUDE AFTER SINKHOLE

The appraiser used the same comparable sales and adjusted the amenity comparison 30% to reflect superior conditions of the sales with deep water access to the subject property which now requires more than $150,000 in adjustment costs to prevent further failure and restore deep water access.  The subject property experiences functional obsolescence without the adjustment costs as the boat lift installed on the subject property is not necessary for the smaller shallow-bottom crafts that are more appropriate for the changed conditions after the sinkhole.  The amenities enjoyed by the property before the sinkhole are negated in part and the existing recreational amenities obsolete as the dock and boat lift are designed for a large recreational vessel – not a shallow bottom boat that requires a draft of less than four (4) feet.  While there is a water view and partial water access, at high tide, from the existing improvements, premium residential buyers considering residential estates of this size maintain options and are deterred by adverse easements.  These buyers have the liquidity, ability, and option to move on to other choices.

### IMPROVED COMPARABLE SALES ADJUSTMENT GRID – AFTER

The appraiser used the comparable sales approach to determine the value of the property after the sinkhole caused by the failure to maintain the drainage easement and its improvements.  The appraiser utilized the same sales, found in the immediate local market, and adjusted the amenity

comparison to reflect that the subject's lack of deep water access at all times and costs to restore.

| SALES COMPARABLE TO THE FERNAAYS PROPERTY AFTER SINKHOLE | | | | | |
|---|---|---|---|---|---|
| | Subject | 1 | 2 | 3 | 4 |
| Address | 207 Deep Water Way | 23242 Pearl Court | 216 Deep Water Way | 215 Deep Water Way | 208 Marsh View Court |
| Locality | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight | Isle of Wight |
| Sale Date | 2/23/2021 | 4/29/2019 | 5/7/2019 | 9/30/2019 | 9/1/2020 |
| Sales Price | | $485,000 | $535,000 | $700,000 | $445,000 |
| Size (SF) | 2,406 | 2,433 | 2,105 | 5,770 | 3,318 |
| Conditions | | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Rights | | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Financing | | Typical | Typical | Typical | Typical |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Timing | | Inferior | Inferior | Inferior | Inferior |
| | | 20% | 20% | 15% | 5% |
| | | | | | |
| Adjusted Sales Price ($) | | $582,000 | $642,000 | $805,000 | $467,250 |
| | | | | | |
| Location | Brewer's Creek | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Condition | Built in 1999 | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% |
| | | | | | |
| Improvements | 3 bed / 3 bath | Similar | Similar | Superior | Superior |
| | | 0% | 0% | -25% | -5% |
| | | | | | |
| Amenities | 1.77 acre lot | Superior | Superior | Similar | Superior |
| | water view | -30% | -30% | -30% | -25% |
| | partial water access | | | | |
| Overall | | -30% | -30% | -55% | -30% |
| | | | | | |
| Indicated Price | | $407,400 | $449,400 | $362,250 | $327,075 |
| | | | | | |
| Indicated Value of Subject | $385,000 | | | | |

**VALUATION OF REMAINDER AFTER SINKHOLE**

The valuation of the subject property after the sinkhole is appraised at THREE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($385,000.00).

**SUMMARY**

The value of the property before the adverse easement condition, $575,000, less the value of the property after the adverse easement condition, $385,000, reflects $190,000 owed in just compensation.

## AFFIDAVIT AND CERTIFICATION OF VALUE

I certify that, to the best of my knowledge and belief:

1.     The statements of fact contained in this report are true and correct.

2.     The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.     I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4.     I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.     My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.     My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.     My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute which include the *Uniform Standards of Professional Appraisal Practice*.

8.     The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives

9.     I have made personal visits to the property that is the subject of this certification.

10.    No one has provided significant real property appraisal assistance to the person signing this certification.

11.    As of the date of this report, I, Dennis W. Gruelle have completed the continuing education program of the Appraisal Institute and am certified by the States of North Carolina and Virginia as a Certified General Real Estate Appraiser.

12.  To the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and The Standards of Professional Appraisal Practice of the Appraisal Institute.

13.  I have not performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

14.  The opinion of value contained in this report for just compensation is $190,000.  The effective date of value is February 23, 2021.


_Dennis W. Gruelle_                                              10-7-2021

Dennis W. Gruelle, MAI, SRA                                    Date
Virginia Certified General
Real Estate Appraiser #4001001489

24

**ADDENDA**

# QUALIFICATIONS OF
## Dennis W. Gruelle, MAI, SRA

**PROFESSIONAL DESIGNATIONS/CERTIFICATIONS**

MAI and SRA - Appraisal Institute
Commonwealth of Virginia Certified General Real Estate Appraiser No. 4001 001489
State of North Carolina State Certified General Real Estate Appraiser No. A3562

**ACCREDITED APPRAISAL COURSES**

**Appraisal Courses Attended and Completed**
Virginia Real Estate Appraiser Law Course
Course SE700 The Appraiser as an Expert Witness
Course 710 Condemnation Appraising
Condemnation Valuation
Standards of Professional Practice
Course 101 Principles and Theory
Course 102 Applied Residential Property Valuation
Course 202 Applied Income Property Valuation
Course 510 Advanced Income Capitalization

**Appraisal Examinations Challenged and Passed**
Real Estate Appraisal Principles (1A-1)
Basic Valuation Procedures (1A-2)
Case Studies in Real Estate Valuation (2-1)
Course 201 - Substitute Credit (AIREA CAP A & B)

**Appraisal Courses with no Exam**
Introduction to Cash Flow and Risk Analysis (310)
Marketability and Market Analysis (311)
Real Estate Investment Analysis (312)
Professional Practice
Advanced Capitalization (510)

**EDUCATION**

Graduate of Illinois State University, B.S. 1974

**PROFESSIONAL EXPERIENCE**

Senior Appraiser associated with the firm of Appraisal Consultation Group. Appraisal experience includes the analysis and preparation of appraisal reports, evaluating a variety of interests in numerous property types including single and multi-family, office, retail, rural, special purpose properties and right-of-way.

Appraisal work product has been accepted and utilized for mortgage lending, estate tax planning and settlement, property exchange, corporate management decisions and partial taking/just compensation analysis by acquiring agencies and property owners. I have qualified as an expert witness in State courts of Texas, Virginia and North Carolina as well as Federal Courts.

Professional Activities: Certified Instructor with the International Right of Way Association, Inc.

Dennis W. Gruelle's fee for this appraisal will be $1,500.00 and his hourly rate is $300/hour for deposition, trial testimony and deposition and trial preparation and travel.